RAILROAD COMMISSION
OF TEXAS, Appellant,

v.

ARCO OIL AND GAS COMPANY, A division of ATLANTIC RICHFIELD COMPANY, Mobil Producing Texas & New Mexico, Inc., and Oxy USA Inc., Appellees.

No. 3–91–504–CV.

Court of Appeals of Texas, Austin.

April 13, 1994.
Rehearing Overruled June 22, 1994.

Dan Morales, Atty. Gen., Diane Weidert Morris, Don Walker, Asst. Atty. Gens., Austin, for appellant.

Michael E. McElroy, McElroy & Sullivan, Austin, for ARCO Oil and Gas Co., A Division of Atlantic Richfield Co.

Ray Langenberg, Mr. Wallace H. Scott, Jr.; Scott, Douglass & Luton, Austin, for OXY USA Inc.

Philip F. Patman, Patman & Patman, Austin, for Mobil Producing Texas & New Mexico, Inc.

Before CARROLL, C.J., and JONES and KIDD, JJ.

## ON MOTION FOR REHEARING

JONES, Justice.

The opinion and judgment issued herein on August 25, 1993, are withdrawn, and the following opinion is substituted for the earlier one.

Pursuant to section 2001.038 of the Administrative Procedure Act ("APA"), Tex.Gov't Code Ann. §§ 2001.001–.902 (West 1994),[1]

---

1. All citations in this opinion are to the current Administrative Procedure Act rather than the for-

ARCO Oil and Gas Company, A Division of Atlantic Richfield Company; Mobil Producing Texas & New Mexico, Inc.; and OXY USA Inc. (collectively, "the oil companies"), appellees, filed suit in the district court of Travis County challenging the validity of Statewide Rule 90(b)(2) promulgated by the Railroad Commission of Texas ("the Commission"), appellant. The trial court overruled the Commission's plea to the jurisdiction. Following a bench trial, the trial court declared the rule invalid and enjoined its enforcement. On appeal, the Commission asserts that the trial court lacked jurisdiction, committed procedural errors, and erred in holding the rule invalid. We will affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The oil companies are operators in the East Texas Field, a large "water-driven" oil reservoir. As oil is removed from the reservoir, it is replaced by water moving upward from the structurally lower portion of the field. The structurally highest wells in a water-driven field have a natural advantage over structurally lower wells, because the higher wells produce for a longer period of time before water reaches them. In the East Texas Field, the structurally higher portion of the reservoir is the east side of the field.

The Commission has previously adopted special field rules for the East Texas Field, two of which affect the maximum allowable rate of oil production from wells in the field. "Field Rule 23" sets a maximum production rate of approximately twenty barrels of oil per well per day. The "Earned Salt Water Allowable" rule grants a bonus oil allowable in certain circumstances. Such special field rules have always been adopted by the Commission after a "trial type" evidentiary hearing.

For more than half a century, the Commission conducted monthly "statewide hearings," one purpose of which was to produce "general market demand orders." These monthly orders were another mechanism used to restrict the amount of oil that wells could produce, and were designed in part to prevent the production of oil from exceeding the lawful market demand. Later, the Commission used a monthly "market demand factor" to accomplish this regulation of production. The market demand factor was a percentage that was applied to each well's allowable, as determined by statutory law and the Commission's rules, to regulate the amount each well would be allowed to produce for the upcoming month.

Before 1972 all oil fields in the State were set at a factor below 86%. From 1972 until November 1990, the Commission set the Market Demand Factor for the East Texas Field and the Kelly–Snyder Field at 86%, while the factor for the rest of the fields in the State was set at 100%.[2] In the fall of 1990, OXY and Mobil challenged the Commission's Market Demand Orders for October and November 1990. The district court in that case rendered a final judgment determining that the Commission's procedure at the Statewide Hearings, in combination with the adoption of monthly Market Demand Orders, did not comply with the procedural requirements of the APA for either contested cases or rulemaking. The court enjoined the Commission from using its monthly Statewide–Hearing procedure to impose restrictions on oil production. The Commission did not appeal from this judgment, but chose instead to re-adopt the same restrictions on oil production using the rulemaking procedures set forth in the APA. *See* APA §§ 2001.021–.038.

By order dated April 1, 1991, after endeavoring to comply with the APA's rulemaking requirements, the Commission adopted Rule 90, which provides in pertinent part:

(b) The lawful allowable for all oil wells shall be the schedule allowable multiplied by a factor of 100% except as otherwise provided in this section.

mer Administrative Procedure and Texas Register Act because the recent codification did not substantively change the law. Act of May 4, 1993, 73rd Leg., R.S., ch. 268, § 47, 1993 Tex. Gen.Laws 583, 986.

2. The Kelly–Snyder Field is not at issue in this case, because the reservoir is depleted to the point that no wells in that field are capable of producing above an 86% factor.

(1) The schedule allowable for all oil wells in the Kelly–Snyder Field shall be multiplied by a factor of 86%.

(2) The schedule allowable for all oil wells in the East Texas Field shall be multiplied by a factor of 86%.

. . . .

(d) The commission, in order to prevent waste or the confiscation of property, may grant exceptions to this section by assigning a different production factor.

(1) An exception may only be granted after notice and hearing.

(2) An application for an exception to this provision shall clearly identify the wells for which an exception is sought and the proposed production factor to be assigned each well.

16 Tex.Admin.Code § 3.90(b), (d) (1993).

In its brief to this Court, the Commission characterizes Rule 90 as the "successor" to the monthly General Market Demand Orders. The oil companies take exception to this characterization, arguing that the Commission used the monthly General Market Demand Orders to restrict production in order to prevent "surface waste" that could result from production of oil in excess of the market demand, while no attempt has been made to justify Rule 90 on the basis of inadequate market demand.

The oil companies brought this suit pursuant to section 2001.038 of the APA, which permits a party whose legal rights or privileges are impaired or threatened by an agency rule to challenge the "validity or applicability" of the rule. Although the oil companies challenged the validity of Rule 90(b)(2) on numerous grounds, the trial court's eight conclusions of law were more narrow, as evidenced by the following three pivotal conclusions:

2. There is no substantial evidence to support the Commission's stated purpose in Statewide Rule 90 to prevent waste and to protect correlative rights in the East Texas Field, therefore, Rule 90(b)(2) violates (1) the Equal Protection Clause of the United States Constitu-

tion, (2) the Equal Rights Clause of the Texas Constitution, (3) the prohibition against the taking of property without just compensation in the United States Constitution and, (4) the prohibition against the taking of property without adequate compensation in the Texas Constitution.

. . . .

4. Railroad Commission Rule 90(b)(2) was not adopted in substantial compliance with the Administrative Procedure and Texas Register Act because it lacks a reasoned·justification.

. . . .

6. Statewide Rule 90(b)(2) violates Section 85.042 of the Natural Resources Code because it is inconsistent with the top rate of production set by East Texas Field Rule 23 and the Earned Salt Water Allowable Rule of the East Texas Field Rules.

On the basis of its conclusions of law, the trial court declared Rule 90(b)(2) invalid and enjoined the Commission from enforcing it.[3]

■ Section 2001.038 of the APA does not provide any standard by which to determine the validity of an agency rule. This Court has held, however, that an agency rule is invalid if (1) the agency had no statutory authority to promulgate it; (2) it was not promulgated pursuant to proper procedure; or (3) it is unconstitutional. *See Helle v. Hightower*, 735 S.W.2d 650, 654 (Tex.App.— Austin 1987, writ denied); *see also* Bob E. Shannon & James B. Ewbank II, *The Texas Administrative Procedure and Texas Register Act Since 1976—Selected Problems*, 33 Baylor L.Rev. 393, 426–27 (1981). It is obvious from the trial court's conclusions of law that it found all three of the foregoing grounds to apply to Rule 90(b)(2): conclusion of law two determined Rule 90 to be unconstitutional as a result of insufficient evidence to support the rule's factual basis; conclusion of law four determined that the procedure mandated by section 2001.033 of the APA was not followed because the order adopting the rule did not adequately state a reasoned

---

**3.** Conclusion of law eight expressly stated that "[t]he Court declines to make Findings of Fact

since the only issues presented are issues of law."

justification of the rule; and conclusion of law six determined that the Commission lacked authority to promulgate Rule 90(b)(2) because the rule was inconsistent with existing state law.

In six points of error, the Commission attacks the trial court's judgment. In addition to challenging the three principal conclusions of law quoted above, the Commission also raises two threshold questions, one regarding the trial court's jurisdiction and the other regarding the trial procedure and standard of review used by the district court. We will address these threshold issues first.

## TRIAL COURT'S JURISDICTION

■ In its first point of error, the Commission asserts that the doctrine of "primary jurisdiction" deprived the district court of jurisdiction over the oil companies' suit. This doctrine has been explained as follows:

> [C]ourts cannot or will not determine a controversy involving a question which is within the jurisdiction of an administrative tribunal *prior to the decision of that question by the administrative tribunal*, where the question demands the exercise of sound administrative discretion requiring the special knowledge, experience and services of the administrative tribunal to determine technical and intricate matters of fact....

*Kavanaugh v. Underwriters Life Ins. Co.*, 231 S.W.2d 753, 755 (Tex.Civ.App.—Waco 1950, writ ref'd) (emphasis added). In other words, "[p]rimary jurisdiction is the principle which determines whether the court or the agency should make the initial decision." *D & S Invs., Inc. v. Mouer*, 521 S.W.2d 118, 120 (Tex.Civ.App.—Austin 1975, writ ref'd n.r.e.).

The oil companies brought their declaratory-judgment action to challenge Rule 90(b)(2) pursuant to section 2001.038 of the APA, which provides in pertinent part:

> (a) The validity or applicability of a rule ... may be determined in an action for declaratory judgment if it is alleged that the rule or its threatened application

interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff.

> . . . .

> (d) A court may render a declaratory judgment without regard to whether the plaintiff requested the state agency to rule on the validity or applicability of the rule in question.

APA § 2001.038(a), (d).

The Commission argues that the primary-jurisdiction doctrine precludes the oil companies' section–.038 challenge. The Commission contends that it has statutory authority to set production factors in oil and gas fields and that determining the particular factor requires the special skills and expertise of the Commission. Further, the Commission argues that it retains primary jurisdiction over assignment of production factors despite the general application of Rule 90(b)(2), because subsection (d) of Rule 90 specifically provides for an administrative exception hearing. We disagree.

The primary-jurisdiction doctrine does not apply in the present case, because the Commission *did make the initial decision* on the issue of production factors by promulgating Rule 90(b)(2) and designating an 86% production factor for the East Texas Field. The primary-jurisdiction doctrine merely prevents a court from ruling on certain types of questions *before* they have been decided by the administrative agency. Because the Commission in the present case decided the production-factor question when it adopted Rule 90(b)(2), the primary-jurisdiction doctrine does not deprive the district court of jurisdiction.[4]

■ The Commission's claim that it retains primary jurisdiction through providing Rule 90(d) "exception hearings" is without merit. In essence, the Commission contends that, because the exception process is available to dispute the established 86% production factor, the oil companies must exhaust that administrative remedy before applying

---

4. It appears to us that the promulgation of an agency rule will almost always constitute a "decision" by the agency on the matter addressed by the rule. Accordingly, we are unable to envision

a situation in which the primary-jurisdiction doctrine could apply in a proper section–.038 challenge to the validity of a rule.

to the courts for relief. However, the oil companies are not required to exhaust their administrative remedies before initiating a declaratory-judgment action under section .038. *See Texas Dept. of Human Servs. v. ARA Living Ctrs. of Tex., Inc.*, 833 S.W.2d 689, 692–93 (Tex.App.—Austin 1992, writ denied).

■ Moreover, exceptions to the exhaustion-of-remedies requirement exist where such requirement would cause irreparable injury or where administrative remedies are inadequate. *See Public Util. Comm'n v. Pedernales Elec. Coop., Inc.*, 678 S.W.2d 214, 220 (Tex.App.—Austin 1984, writ ref'd n.r.e.); *Texas State Bd. of Pharmacy v. Walgreen Tex. Co.*, 520 S.W.2d 845, 848 (Tex.Civ. App.—Austin 1975, writ ref'd n.r.e.). Requiring the oil companies to first apply for an exception hearing could cause them irreparable injury. Rule 90 was immediately effective. Although subsection (d) provided for exception hearings, no provision was made for staying application of the 86% production factor pending the outcome of the exception hearing. If, as the oil companies claim, Rule 90(b)(2) is invalid, they would sustain immediate injury during the pendency of an exception hearing. We will not force the oil companies to be subjected to potential irreparable injury while the Commission completes its exception hearings. As the Texas Supreme Court has explained, "An administrative body cannot, by reserving for itself the power to change a ruling, deprive the courts of jurisdiction to the detriment of the parties injured by the ruling." *Glen Oaks Utils., Inc. v. City of Houston*, 161 Tex. 417, 340 S.W.2d 783, 785 (Tex.1960); *see also City of Weslaco v. General Tel. Co.*, 359 S.W.2d 260, 262 (Tex.Civ.App.—San Antonio 1961, writ ref'd n.r.e.). Because Rule 90 went into effect immediately upon its enactment, the oil companies had the immediate right to turn to the courts for relief. *Glen Oaks*, 340 S.W.2d at 785. Further, the statutory language of section .038 clearly indicates that a plaintiff may bring a declaratory-judgment action challenging the validity of an agency rule without first requesting agency review if it is alleged that such rule interferes with or impairs or *threatens to interfere with or impair*

the legal rights or privileges of the plaintiff. *See ARA Living Ctrs.*, 833 S.W.2d at 692–93.

In addition, the Commission's administrative remedies are inadequate to provide the oil companies with the relief requested. A Rule 90(d) "exception hearing" can only determine the validity of the rule as it applies to the oil companies' wells located in the East Texas Field. The oil companies' challenge here, however, is broader than merely the applicability of the rule to their own wells in the East Texas Field. We will not require the oil companies to first be subjected to Rule 90(b)(2) before they may challenge its validity. The purpose of a section–.038 challenge is "to obtain a final declaration of a rule's validity *before* the rule is applied." *Rutherford Oil Corp. v. General Land Office*, 776 S.W.2d 232, 235 (Tex.App.—Austin 1989, no writ). Because the relief available under the remedy provided by the Commission is inadequate, we will not require the oil companies to pursue this remedy before bringing a declaratory-judgment action.

We reject the Commission's primary-jurisdiction and exhaustion-of-remedies challenges to the trial court's jurisdiction. We hold that the district court had jurisdiction to reach the merits of the oil companies' challenge to Rule 90(b)(2), and we overrule the Commission's first point of error.

**TRIAL COURT PROCEDURE**

■ In point of error six, the Commission asserts that the trial court erred in receiving evidence outside of the agency order adopting the rule, instead of determining the validity of Rule 90(b)(2) from the four corners of the order. Regarding the reception of evidence outside the order adopting Rule 90(b)(2), the APA requires that an agency order finally adopting a rule must include:

(1) a reasoned justification of the rule, including:

 (A) a summary of comments received from parties interested in the rule that shows the names of interested groups or associations offering comment on the rule and whether they were for or against its adoption;

 (B) a restatement of the rule's factual basis; and

(C) the reasons why the agency disagrees with party submissions and proposals;

(2) a concise restatement of the particular statutory provisions under which the rule is adopted and of how the agency interprets the provisions as authorizing or requiring the rule.

APA § 2001.033. The oil companies in the present case have not focused their challenge on the requirement that the order include a summary of comments received, the names of the interested groups, or whether such interested groups were for or against the rule's adoption; nor have they asserted that the order fails to state the reasons why the agency disagrees with party submissions and proposals. Rather, all parties have focused their attention on the essential requirements of section .033 that the agency's order include "a reasoned justification of the rule, including ... a restatement of the rule's factual basis." Accordingly, in this opinion we will direct our attention to these disputed areas.

By requiring an agency to state expressly a "reasoned justification" for a rule, including the factual events, conditions, and circumstances that motivated the agency to adopt the rule, the legislature apparently intended to bring the decision-making process more into the open. By requiring such a public statement, however, it seems to us the legislature intended to help guarantee a kind of procedural fairness for interested parties who participate in the rulemaking process, not to create a type of statutory substantive-due-process requirement whereby the underlying factual accuracy of the events, conditions, and circumstances recited in the agency's order would be subject to attack.[5] Accordingly, we agree with Professor Beal that, in this type of challenge, the reasoned-justifi-

cation requirement imposed by section .033 limits the source of proof available

> to the final notice prepared by the agency. The court should not employ any presumptions nor should it receive evidence anew.... The Legislature now clearly implies that the court ... should determine the rationality of the decision based *solely* on what was known and relied upon by the agency. Thus, the standard of review by the judiciary has *not* changed in determining the validity of a rule; that review is merely restricted to the four corners of the agency's final notice.

Ron L. Beal, *The Scope of Judicial Review of Agency Rulemaking: The Interrelationship of Legislating and Rulemaking in Texas*, 39 Baylor L.Rev. 597, 690 (1987) (footnotes omitted) (hereinafter referred to as "Beal (I)"); *see also Methodist Hosps. v. Texas Indus. Accident Bd.*, 798 S.W.2d 651, 659 (Tex.App.—Austin 1990, writ dism'd w.o.j.). We conclude, therefore, that the type of reasoned-justification challenge asserted in this case must be determined from the face of the agency record.[6]

In the present case, however, the fact that additional evidence is not to be considered in applying the reasoned-justification standard does not mean that the trial court erred in receiving such evidence. The oil companies challenged the validity of Rule 90(b)(2) on numerous grounds, including several constitutional bases. Such constitutional challenges are not determined in the same way as a reasoned-justification challenge under section .033, but are more substantive in nature and may require evidence not presented to the agency. Thus, in discussing whether a party who did not participate in the agency's rulemaking proceedings can nonetheless challenge the validity of the rule, Professor Beal concludes:

---

**5.** One exception to this statement might be an order that is an intentional sham. In the present case, no one pleaded that the order adopting Rule 90 was purposefully deceptive.

**6.** We do not mean by this statement to imply that *all* section–.033 challenges to an agency rule must be determined from the face of the agency record. In many instances, that would not be possible. For example, if an agency order adopt-

> ing a rule failed to list the name of an interested party who had made comments, and failed to contain a summary of that party's comments, such failure could be shown *only* by evidence outside the agency record, i.e., outside the order adopting the rule. The trial court should permit such a showing, however, only when it is necessary to properly assess the merits of the challenge.

Even if it was determined a non-participant could not assert a lack of reasoned justification, he or she is not deprived of asserting a general challenge to the rationality of the rule on a constitutional basis. It has been long held that a legislative pronouncement can not forestall attack upon the factual basis of a rule. However, the issue is no longer one of whether there is evidence and a rationale *stated in the agency's final notice* that substantiates the agency action and the agency should be afforded the general presumption of rationality in fact that is accorded the Legislature. The contestant can challenge the rule on the sole issue of whether there is no basis in fact for the action taken. Thus, the legislature may properly limit the reasoned justification inquiry to the four corners of the final notice for it does not deprive a non-participant of any right to challenge the rule's constitutionality.

Beal (I), *supra,* at 694 (footnotes omitted); *see also* Ron Beal, *Challenging the Factual Basis and Rationality of a Rule Under AP-TRA,* 45 Baylor L.Rev. 1, 40 (1993) (hereinafter "Beal (II)").

Because the oil companies' attack on the validity of Rule 90(b)(2) included constitutional challenges as well as a reasoned-justification challenge, the trial court did not err in receiving evidence outside the four corners of the order adopting the rule. Moreover, there is no indication the trial court considered any of the outside evidence in deciding the reasoned-justification issue. Accordingly, the Commission has not shown that the trial court used the outside evidence improperly or applied an incorrect standard of review. We overrule point of error six.

## VALIDITY OF RULE 90(b)(2)

The Commission supported its adoption of Rule 90 on two bases: prevention of waste and protection of correlative rights. The validity of the rule may be upheld on either basis. As discussed above, the trial court held Rule 90(b)(2) to be invalid on three separate and distinct grounds: (1) lack of statutory authority; (2) failure to follow APA-mandated procedure; and (3) unconstitutionality. Accordingly, we must apply each of these grounds to both of the bases of authority on which Rule 90 was promulgated. If both of the two bases of authority fall short on any of the three asserted grounds of invalidity, the rule is invalid. On the other hand, if either of the bases survives all three grounds, the rule is valid. We will first address the protection-of-correlative-rights basis.

## I. Protection of Correlative Rights.

■■ In point of error three, the Commission asserts that the trial court erred in determining in conclusion of law six that Rule 90(b)(2) was inconsistent with the Natural Resources Code and the Commission's own East Texas Field Rules. It is well established that an agency has no authority to adopt a rule that is inconsistent with existing state law. *Gerst v. Oak Cliff Sav. & Loan Ass'n,* 432 S.W.2d 702, 706 (Tex.1968). As a corollary to their argument that Rule 90(b)(2) is inconsistent with existing state law, the oil companies also contend that the Commission simply had no statutory authority to use APA rulemaking procedures to protect correlative rights of oil producers. We are, of course, required to uphold the trial court's judgment if it is correct on any theory of law applicable to the case. *Custom Leasing, Inc. v. Texas Bank & Trust Co.,* 516 S.W.2d 138, 142 (Tex.1974). The oil companies' petitions in the district court alleged that the Commission lacked statutory authority to use APA rulemaking procedures to promulgate Rule 90. Accordingly, that theory of law is applicable here, and we will address it.

### A. Standard for Validity of Rules

■ "[A]n agency can adopt only such rules as are authorized by and consistent with its statutory authority." *Railroad Comm'n v. Lone Star Gas Co.,* 844 S.W.2d 679, 685 (Tex.1992) (quoting *State Bd. of Ins. v. Deffebach,* 631 S.W.2d 794, 798 (Tex. App.—Austin 1982, writ ref'd n.r.e.)). In this connection, it is well settled that an agency rule may not impose additional burdens, conditions, or restrictions in excess of or inconsistent with the relevant statutory provisions. *See Kelly v. Industrial Accident Bd.,* 358

S.W.2d 874, 876–77 (Tex.Civ.App.—Austin 1962, writ ref'd); *Hollywood Calling v. Public Util. Comm'n,* 805 S.W.2d 618, 620 (Tex. App.—Austin 1991, no writ); *Riess v. Appraisal Dist.,* 735 S.W.2d 633, 638 (Tex. App.—Austin 1987, writ denied); *Texas Fire & Casualty Co. v. Harris County Bail Bond Bd.,* 684 S.W.2d 177, 178 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.). Stated another way, "[i]n order for an agency's regulation to be considered a part of the regulatory statute the regulation ... must come within the framework of the power delegated." *Bexar County Bail Bond Bd. v. Deckard,* 604 S.W.2d 214, 217–18 (Tex.Civ.App.—San Antonio 1980, no writ). "An agency's authority to promulgate rules and regulations 'may be expressly conferred on it by statute or implied from other powers and duties given or imposed by statute.'" *Lone Star Gas,* 844 S.W.2d at 685 (quoting *Dallas County Bail Bond Bd. v. Stein,* 771 S.W.2d 577, 580 (Tex.App.—Dallas 1989, writ denied)). *But cf. Railroad Comm'n v. City of Austin,* 524 S.W.2d 262, 267 (Tex.1975) ("This Court has generally held that the Commission has only such powers as are *specifically* delegated to the Commission.").

B. *The Nature of the Correlative Rights Doctrine*

The doctrine of correlative rights in oil and gas law developed partly as a corollary to the so-called "rule of capture." Under the rule of capture, "the owner of a tract of land acquires title to the oil or gas which he produces from wells on his land, though part of the oil or gas may have migrated from adjoining lands." *Elliff v. Texon Drilling Co.,* 146 Tex. 575, 210 S.W.2d 558, 561–62 (1948). *See generally* Robert E. Hardwicke, *The Rule of Capture and its Implications as Applied to Oil and Gas,* 13 Tex.L.Rev. 391 (1935). For many years the rule of capture prevailed in oil and gas law, notwithstanding that Texas law recognized that each owner of land situated above a reservoir had absolute ownership of the minerals under his tract. The rule of capture was thought to produce an equitable result because (1) each landowner was presumed to be able to protect himself against his neighbors' overproduction by exercising his own "correlative right" to drill

more wells and produce more oil, and (2) the nature of underground oil reservoirs was so poorly understood that the "capture" of oil was analogized to the capture of wild animals that roamed from forest to forest. However, after advancements in scientific methods allowed engineers to understand more fully the migratory characteristics of oil and gas and to estimate more accurately the recoverable deposits in oil and gas reservoirs, the unmodified application of the rule of capture came to be seen as unfair and unnecessary. *See* Hardwicke, *supra,* at 393–94; A.W. Walker, Jr., *Property Rights in Oil and Gas and Their Effect Upon Police Regulation of Production,* 16 Tex.L.Rev. 370 (1938). The idea of using laws and administrative proceedings to protect the correlative rights of operators in a common reservoir arose, in part, out of this perception of unfairness.

The supreme court recently discussed the correlative rights doctrine:

"Correlative rights guarantee a mineral interest owner an opportunity to produce a 'fair share' of the reserves underlying his land." *Texaco Producing, Inc. v. Fortson Oil Co.,* 798 S.W.2d 622, 624 (Tex.App.—Austin 1990, no writ). "There appear to be two aspects of the doctrine of correlative rights: (1) as a corollary of the rule of capture, each person has a right to produce oil from his land and capture such oil or gas as may be produced from his well, and (2) a right of the land owner to be protected against damage to a common source of supply and a right to a fair and equitable share of the source of supply." 8 H. Williams & C. Meyers, *Oil and Gas Law: Manual of Oil and Gas Terms* 257 (1991). Although "a landowner is entitled to an opportunity to produce his fair share of oil from a common reservoir, this rule is qualified by both the rule of capture and the Commission's authority to prevent waste." *Texaco, Inc. v. Railroad Comm'n,* 583 S.W.2d 307, 310 (Tex.1979).

*Lone Star Gas,* 844 S.W.2d at 683 n. 2.

Texas courts have long recognized that the Commission is charged with a duty to protect the correlative rights of oil well operators in a common pool. *See Texaco, Inc. v. Railroad*

*Comm'n,* 583 S.W.2d 307, 310 (Tex.1979) ("It is now well settled that the Railroad Commission is vested with the power and charged with the duty of regulating the production of oil and gas for the prevention of waste as well as for the protection of correlative rights."). *See generally* R.O. Kellam, *A Century of Correlative Rights,* 12 Baylor L.Rev. 1 (1960); Walker, *supra,* at 375–79. The question for decision here, however, is not whether the Commission has a general duty to protect the correlative rights of oil producers, but whether it has statutory authority to protect such rights through the use of APA rulemaking procedures.

### C. *Statutory Authority of the Commission*

In its order, the Commission cited numerous statutory provisions as providing it authority to adopt Rule 90:

> This section is adopted pursuant to Texas Natural Resources Code, Title 3, §§ 85.-042, 85.045, 85.046, 85.048, 85.051, 85.053, 85.056, 85.202(a)(1), (a)(4), (b), Texas Constitution article I § 17, article XVI, § 59a (giving the commission authority to adopt rules necessary to prevent waste and to protect correlative rights), 85.058 (requiring the commission to take corrective action when the conservation laws or rules of the commission are being violated), and 85.059 (requiring persons to keep accurate records of oil produced).

None of the cited provisions *expressly* authorizes the Commission to use APA rulemaking procedures for the purpose of protecting correlative rights of oil producers. The remaining question, then, is whether Title 3 of the Natural Resources Code ("the Code"), Tex. Nat.Res.Code Ann. §§ 81.001–117.101 (West 1993 & Supp.1994), *impliedly* authorizes the Commission to do so. We conclude it does not, for three reasons: (1) it is doubtful that the Commission has any authority to use rules at all to protect correlative rights of oil producers; (2) even if it does have such authority, the Commission's enabling legislation contemplates that an evidentiary, trial-type hearing will be held before the Commission adopts rules to protect such correlative rights; and (3) the enactment of the APA in 1975 did not repeal this existing statutory requirement of an evidentiary hearing.

■ (1) *It is doubtful that the Commission has any authority to use rules at all to protect correlative rights of oil producers.* Irrespective of the procedure the Commission uses, there appears to be a serious question whether the Commission has authority, for the purpose of protecting the correlative rights of oil well owners and operators, to promulgate rules at all. To begin with, there is no provision in the Code expressly giving the Commission authority to adopt rules to protect correlative rights of oil producers. Next, although Chapter 85 of the Code, the relevant chapter and the one on which the Commission relies, contains many provisions expressly authorizing the Commission to adopt rules, each of those provisions contains an explicit statement of the purposes for which the Commission may promulgate such rules. None of the relevant statutory provisions includes protection of correlative rights as an authorized purpose. The following are representative:

§ 85.042. **Rules and Orders**

. . . .

(b) When necessary, the commission shall make and enforce rules either general in their nature or applicable to particular fields *for the prevention of actual waste of oil or operations in the field dangerous to life or property.*

Code § 85.042 (emphasis added).

§ 85.201. **Adoption of Rules and Orders**

The commission shall make and enforce rules and orders *for the conservation of oil and gas and prevention of waste of oil and gas.*

Code § 85.201 (emphasis added).

§ 85.202. **Purposes of Rules and Orders**

. . . .

(b) The commission shall do all things necessary *for the conservation of oil and gas and prevention of waste of oil and gas* and may adopt other rules and orders *as may be necessary for those purposes.*

Code § 85.202 (emphasis added); *see also* Code §§ 85.042(a), .049, .051, .202(a), .203, .205. Under the familiar doctrine of *expres-*

*sio unius est exclusio alterius,* the legislature's express authorization for the Commission to promulgate rules for specified purposes would seem to imply a lack of authorization to adopt rules for a different purpose. *See, e.g., State v. Mauritz–Wells Co.,* 141 Tex. 634, 175 S.W.2d 238, 241 (1943); *Peterson v. Calvert,* 473 S.W.2d 314, 317 (Tex. App.—Austin 1971, writ ref'd); *Maley v. 7111 Southwest Freeway, Inc.,* 843 S.W.2d 229, 231 (Tex.App.—Houston [14th Dist.] 1992, writ denied). Numerous opinions of the Texas Supreme Court further confirm that conservation of oil and gas and prevention of waste of those minerals were the dominant public policy concerns behind the creation and empowerment of the Railroad Commission. *See, e.g., Railroad Comm'n v. Sterling Oil & Ref. Co.,* 147 Tex. 547, 218 S.W.2d 415, 418 (1949); *Railroad Comm'n v. Shell Oil Co.,* 146 Tex. 286, 206 S.W.2d 235, 238–42 (1947). Indeed, in all of Chapter 85, the subject of correlative rights is virtually unmentioned, and even the few provisions that do touch on the concept say nothing about the use of rules. *See* Code §§ 85.-046(b), .053(a). Finally, we note that Chapter 86 of the Code, which relates only to *natural gas,* does contain provisions that would appear to expressly authorize the Commission to adopt rules for the purpose of protecting correlative rights of owners and operators of gas wells. *See* Code §§ 86.041, .042(9) (authorizing Commission to adopt rules to accomplish purposes of Chapter 86); *see also* Code §§ 86.001, .081, .083, .090 (declaring adjustment of correlative rights of gas well owners in common reservoirs to be one purpose of Chapter 86). Nonetheless, even under Chapter 86, the supreme court has pointedly left open the question of whether the Commission has statutory authority to promulgate rules for that purpose. *See Lone Star Gas,* 844 S.W.2d at 688 n. 8.

Thus, it is problematic whether the Commission has any authority to adopt rules for the purpose of protecting the correlative rights of oil well owners and operators, irrespective of the procedure used to adopt such rules. However, since we conclude that the Commission did not use the required procedure in adopting Rule 90(b)(2), we need not decide whether it has general authority to adopt rules for that purpose.

■ (2) *Even if it does have authority to adopt rules to protect correlative rights of oil producers, the Commission's enabling legislation contemplates that an evidentiary, trial-type hearing will be held before the Commission adopts rules for that purpose.* The only statutory provision we have been able to locate that expressly imposes on the Commission a duty to protect the correlative rights of oil well owners and operators is section 85.053(a) of the Code:

> If a rule or order of the commission limits or fixes in a pool or portion of a pool the production of oil, or the production of gas from wells producing gas only, the commission shall distribute, prorate, or otherwise apportion or allocate the allowable production among the various producers on a reasonable basis.

Code § 85.053(a). The mandate to allocate the allowable production of a pool among the various producers of the pool on a reasonable basis clearly falls within the concept of protecting correlative rights. The provision does not, however, address whether the Commission should make such allocation by "order" or by "rule." Thus, even section 85.053(a) does not require the conclusion that the Commission is authorized to use rules to protect correlative rights of oil producers.

We will assume without deciding that the Commission is authorized to make the allocation by rule rather than by order. Nonetheless, we conclude that the statute requires an evidentiary hearing before any such action is taken. Indeed, section 85.053(a) and the sections of the Code that precede it explicitly contemplate such a hearing:

> § 85.049. Hearing
>
> (a) On verified complaint of any person interested in the subject matter that waste of oil or gas is taking place in this state or is reasonably imminent, or on its own initiative, the commission, after proper notice, may hold a hearing to determine whether or not waste is taking place or is reasonably imminent and if any rule or order should be adopted or if any other action should be taken to correct, prevent, or lessen the waste.

(b) The hearing shall be held at the time and place determined by the commission.

## § 85.050. Procedure at Hearing

(a) At the hearing, interested parties shall be entitled to be heard and to introduce evidence and require the attendance of witnesses.

(b) The production of evidence may be required as provided by law.

## § 85.051. Adoption of Rule or Order

If the commission finds at the hearing that waste is taking place or is reasonably imminent, it shall adopt a rule or order in the manner provided by law as it considers reasonably required to correct, prevent, or lessen the waste.

## § 85.052. Compliance With Rule or Order

From and after the promulgation of a rule or order of the commission, it is the duty of each person affected by the rule or order to comply with it.

Code §§ 85.049–.052.

Until the Code was enacted in 1977, the foregoing provisions, along with section 85.053(a), were all combined in article 6049c, § 7 of the Revised Civil Statutes:

Sec. 7. Upon the initiative of the Commission, or upon the verified complaint of any person interested in the subject matter, that waste of crude petroleum oil or natural gas is taking place in this State, or is reasonably imminent, the Commission may hold a hearing, at such time and place as it may fix, to determine whether or not waste is taking place, or is reasonably imminent and what, if any, rule, regulation, or order should be made or what, if any, other action should be taken to correct, prevent or lessen such waste. At said hearing all parties interested shall be entitled to be heard and introduce evidence and to require the attendance of witnesses, and the production of evidence may be required as provided by law. If upon the hearing the Commission shall find that waste is taking place, or is reasonably imminent, the Commission shall make such rule, regulation or order as in its judgment is reasonably required to correct, prevent or lessen such waste.

In the event any such rule, regulation or order which the Commission may adopt provides for the limitation or fixing of the production of crude petroleum oil, or of natural gas from wells producing gas only, in any pool or portion thereof, the Commission shall distribute, prorate, or otherwise apportion or allocate, the allowable production among the various producers on a reasonable basis.

From and after the promulgation of any rule, regulation or order of the Commission it shall be the duty of each person affected thereby to comply with the same.

Act of April 8, 1935, 44th Leg., R.S., ch. 76, § 6, 1935 Tex.Gen. Laws 180, 185–86. The adoption of the Code in 1977 was a non-substantive codification. See Act of May 24, 1977, 65th Leg., R.S., ch. 871, § 15, 1977 Tex.Gen. Laws 2345, 2697. Accordingly, any minor differences in language between the relevant sections of the Code and article 6049c, § 7 may not be considered significant.

What sort of hearing did section 7 of article 6049c require? One important source for determining the answer to this question is the Commission's own historical practice, because the construction given a statute by the agency charged with its enforcement is often accorded considerable weight by courts faced with construing the same statute. See *Tarrant Appraisal Dist. v. Moore,* 845 S.W.2d 820, 823 (Tex.1993) ("serious consideration"); *Southwest Airlines Co. v. Bullock,* 784 S.W.2d 563, 568 (Tex.App.—Austin 1990, no writ) ("great weight").

Over time, the Commission developed a system in which two types of hearings were conducted: "statewide" hearings and "special" hearings. The procedures used in these types of hearings were dramatically different:

### A. *Statewide Hearings*

Statewide hearings are held monthly in Austin primarily to set the State's allowable production. Occasionally, statewide hearings are called to consider, in addition to allowables, specific items of general interest such as, for example, the adoption or

revision of statewide rules or regulations. Each month the Commission mails notices to operators whose names appear on a list maintained by the Commission. At their request, other interested persons may be placed on this mailing list. The regular form of the notice for the statewide hearing is extremely general; but if matters other than allowables are to be considered, they usually will appear in the notice. The three Commissioners usually are present at the hearing, with the Chairman presiding. The hearings are conducted like mass meetings; anyone is given the opportunity to speak. Sworn testimony rarely is received, and evidence usually is not introduced. Prior to a statewide hearing, the Commission obtains nominations from purchasers and forecasts of estimated demand from the Bureau of Mines. Thus, at the time of the hearing the Commissioners have most of the basic data with which to determine the monthly allowable production. During the hearing, purchasers are given the opportunity to announce their nominations and to recommend allowables. Using the data compiled in advance and the information obtained at the hearing, the Commission determines the State's monthly allowable production for the following month and announces that decision at the hearing.

### B. *Special Hearings*

Unlike statewide hearings, special hearings are not scheduled regularly but are called either at the request of an operator or on the Commission's own initiative. The subject matter of special hearings may concern specific operators or specific fields, but does not affect directly the entire oil and gas industry. Special hearings are held before a Commission examiner and frequently involve such matters as the adoption or amendment of field rules, specific exceptions to field or statewide rules, or the determination of productive acreage. The vast majority of oil and gas hearings are special hearings.

Joe Greenhill & Robert C. McGinnis, *Practice and Procedure in Oil and Gas Hearings in Texas*, 18 Sw.L.J. 406, 407–08 (1964) (footnotes omitted). The authors go on to explain that at a special hearing the commissioners are rarely present; an official reporter is present; the customary manner of proceeding is for interested parties to present sworn testimony in question-and-answer form; each witness is tendered for cross-examination during the hearing; and the hearing generally resembles a court trial, although an atmosphere of informality usually prevails. Greenhill & McGinnis, *supra* at 417–28; *see also* Kenneth Culp Davis & York Y. Willbern, *Administrative Control of Oil Production in Texas*, 22 Tex.L.Rev. 149, 164–79 (1944); Granville Dutton, Comment, *Proration in Texas: Conservation or Confiscation?*, 11 Sw.L.J. 186, 186–90 (1957).

Thus, the Commission's statewide hearings have been conducted primarily to set the allowable production for the state, and secondarily to consider other items of general interest such as statewide rules. The Commission's special hearings, on the other hand, have involved matters of less than general interest such as the adoption or amendment of field rules.

Rule 90(b)(2) is, for all intents and purposes, a field rule. It purports to limit production for the East Texas Field only, while other fields in the state are treated differently. Because its effect is confined to the East Texas Field, it cannot fairly be called a "statewide" rule of general interest to the oil and gas industry as a whole. Nor do we think the Commission can convert separate field rules into a statewide rule of general interest merely by combining the field rules into a single "rule" with multiple subdivisions.[7]

---

7. We do not, however, hold that Rule 90(b)(2) is not a "rule" merely because it has less than statewide application. A "rule" is defined in the APA as "a state agency statement of general applicability." APA § 2001.003. Although Rule 90(b)(2) does not apply to all oil fields in the state, we believe it still can be considered to be of "general applicability" and therefore to fall within the APA's definition of a "rule." *See Grand River Dam Auth. v. State*, 645 P.2d 1011, 1016 (Okl.1982); *Simpson Tacoma Kraft Co. v. Department of Ecology*, 119 Wash.2d 640, 835 P.2d 1030, 1035 (1992); *Citizens for Sensible Zoning, Inc. v. Department of Natural Resources*, 90

Thus, the Commission historically has conducted a "special hearing" before adopting rules such as Rule 90(b)(2). Even beyond statutory requirements, this procedure is particularly appropriate, if not essential, in the area of correlative rights. In our form of government, we generally look to the "legislative" process to protect the public interest, while we rely more often on the "judicial" process to protect private property rights. This approach is also reflected in the APA. In enacting the APA, the legislature has established an administrative scheme wherein private rights are generally determined by contested-case procedures. For contested cases, the APA requires notice and an opportunity for an adjudicative hearing, with concomitant procedures for discovery, evidence, and cross-examination, all designed to maximize procedural safeguards for interested parties. *See* APA §§ 2001.051–.147; *Texas Ass'n of Business v. Texas Air Control Bd.,* 852 S.W.2d 440, 452 n. 26 (Tex.1993). Allowing the use of rulemaking procedures for the protection of correlative rights would be inconsistent with this overall scheme, because interested parties have significantly fewer procedural safeguards under rulemaking procedures than under contested-case procedures. *See* APA §§ 2001.023–.035. The legislature may create such inconsistencies if it so desires, but we are reluctant to attribute to it that intention *by implication,* without an express legislative statement to that effect.

In the context of the present case, although the prevention of waste serves a clear public purpose in the conservation of the state's natural resources, the doctrine of correlative rights involves primarily private property rights—guaranteeing oil well owners and operators an opportunity to produce a fair and equitable share of available minerals from a common reservoir. This distinction is exemplified by the historical treatment of "confiscation" claims, i.e., claims that an operator is producing *more* than his fair share from a common reservoir:

It is now settled that the question of confiscation involves primarily the private property rights of the adjacent leasehold-

Wis.2d 804, 280 N.W.2d 702, 707–08 (1979). *See generally* Arthur Earl Bonfield, *State Admin-*

ers, is one essentially judicial in nature, and is not dependent upon whether waste of the natural resources will result or not. On that issue the exceptions to Rule 37 are grounded primarily on the duty and undertaking of the State, through the Railroad Commission, to see to it that one producer of oil shall not recover more than his fair share of the oil beneath his own land by excess drainage of oil from beneath the land of his neighbor.

*Railroad Comm'n v. Shell Oil Co.,* 154 S.W.2d 507, 509 (Tex.Civ.App.—Austin 1941), *aff'd,* 139 Tex. 66, 161 S.W.2d 1022 (1942). Consistent with this principle, Rule 37 itself requires that all requests for exceptions to the spacing requirements be decided only after a special hearing. *See* 16 Tex.Admin.Code § 3.37(a) (1993).

In sum, the Commission's historical practice of holding special hearings before taking action to protect the correlative rights of oil producers manifests, we believe, a conclusion by the Commission that such a hearing was statutorily required.

Moreover, we conclude, independently of the Commission's historical practices, that section 85.053(a) and other relevant sections of the Code require a hearing in the nature of a special hearing before action may be taken to protect the correlative rights of oil producers. Again, section 85.050 provides that at the hearing, "interested parties shall be entitled to be heard and to introduce evidence and require the attendance of witnesses," and that the production of evidence "may be required as provided by law." Code § 85.050. These procedural requirements are inconsistent with the procedures used in the Commission's statewide hearings. Rather, they more closely resemble the trial-type procedures used by the Commission in its special hearings.

Based on all the foregoing, we conclude that, at least as of 1975, the Commission did not have statutory authority to promulgate rules for the protection of correlative rights of oil producers without conducting a special hearing meeting the procedural requirements for that type of hearing.

*istrative Rule Making* § 3.3.2 (1986 & Supp. 1993).

It is undisputed that the Commission did not conduct a special hearing before promulgating Rule 90. Thus, the Commission had no authority to adopt Rule 90(b)(2) for the purpose of protecting the correlative rights of oil producers unless the law changed in 1975 when the legislature enacted the original version of the APA. *See* Act of April 8, 1975, 64th Leg., R.S., ch. 61, §§ 1–24, 1975 Tex.Gen.Laws 136, 136–48 (Tex.Rev.Civ.Stat. Ann. art. 6252–13a, since repealed and recodified as the APA). The Commission promulgated Rule 90 in accordance with the APA's rulemaking procedures, which do not guarantee the same opportunities for participation by interested parties as the Commission's special hearings provide. *See* APA §§ 2001.023–.035. The remaining question, then, is whether enactment of the APA in 1975 was intended to repeal the procedural requirements in section 7 of article 6049c (the Code was not adopted until 1977).

■ (3) *The enactment of the APA in 1975 was not intended to repeal the existing statutory requirement to hold an evidentiary hearing.* The relevant rulemaking procedures of the APA were contained in section 5(c) of the original version of that act:

> Prior to the adoption of any rule, an agency shall afford all interested persons reasonable opportunity to submit data, views, or arguments, orally or in writing. In the case of substantive rules, opportunity for public hearing must be granted if requested by at least 25 persons, by a governmental subdivision or agency, or by an association having at least 25 members. The agency shall consider fully all written and oral submissions concerning the proposed rule. On adoption of a rule, the agency, if requested to do so by an interested person either prior to adoption or within 30 days after adoption, shall issue a concise statement of the principal reasons for and against its adoption, incorporating in the statement its reasons for overruling the considerations urged against its adoption.

1975 Tex.Gen.Laws 136, 138 (since repealed and recodified as APA §§ 2001.029, .030). Those procedures did not guarantee the same level of participation by interested parties as did the procedures used in the Commission's special hearings. For example, section 5 did not require a hearing in every instance, and even in those instances when a "public hearing" was mandated, section 5 did not specify that an evidentiary, trial-type hearing was required.

A later statute can repeal an earlier one either expressly or by implication. *Gordon v. Lake,* 163 Tex. 392, 356 S.W.2d 138, 139 (1962). The original act enacting the APA in 1975 contained the following repeal provision:

> Sec. 22. Chapter 274, Acts of the 57th Legislature, Regular Session, 1961, as amended (Article 6252–13, Vernon's Texas Civil Statutes), and all other laws and parts of laws in conflict with this Act are repealed. This Act does not repeal any existing statutory provisions conferring investigatory authority on any agency, including any provision which grants an agency the power, in connection with investigatory authority, to take depositions, administer oaths or affirmations, examine witnesses, receive evidence, conduct hearings, or issue subpoenas or summons.

1975 Tex.Gen.Laws 136, 148. Thus, the APA did not contain a "specific" express repeal of any of the Commission's enabling legislation. *See City of Beaumont Indep. Sch. Dist. v. Broadus,* 182 S.W.2d 406, 410 (Tex.Civ. App.—Amarillo 1944, writ ref'd). Although the act did contain a "general" express repeal of all laws "in conflict" with it, such conflicts are determined by the same standard that governs repeal by implication. *City of Port Arthur v. Jefferson County Fresh Water Supply Dist. No. 1,* 596 S.W.2d 553, 556 (Tex.Civ.App.—Beaumont 1980, writ ref'd n.r.e.). Accordingly, we will discuss whether article 6049c, § 7 or any other relevant provisions now contained in the Code were in conflict with the APA in connection with our discussion of whether the APA *impliedly* repealed those statutes.

Statutory repeals by implication are not favored. *Acker v. Texas Water Comm'n,* 790 S.W.2d 299, 301 (Tex.1990).

> A statute is presumed to have been enacted by the legislature with complete knowledge of the existing law and with reference to it.... A legislative enactment covering

a subject dealt with by an older law, but not repealing that law, should be harmonized whenever possible with its predecessor in such a manner as to give effect to both.

*Id.* There must be a clear, positive repugnance between the provisions of the old and new statutes before they will be deemed to be in irreconcilable conflict. *Standard v. Sadler,* 383 S.W.2d 391, 395 (Tex.1964); *Commissioners Court v. Criminal Dist. Attorney, Caldwell County,* 690 S.W.2d 932, 936 (Tex.App.—Austin 1985, writ ref'd n.r.e.).

In addressing this issue, we note initially that the provision for an evidentiary hearing in section 85.053(a) and related sections of the Code may well be considered part of the Commission's "investigatory authority" that is specifically exempted from the APA's repeal provision.[8] We will assume without deciding, however, that this is not the case. This assumption does not alter our conclusion.

One obvious and significant factor in determining whether the APA impliedly repealed the relevant provisions of the Code is that it is entirely possible to comply with both statutory provisions. With respect to notice, the provisions of the Code are general, requiring only that the Commission's hearing be held "after proper notice." *See* Code § 85.049(a). The notice requirements of the APA, on the other hand, are more specific. *See* APA §§ 2001.023–.026. With respect to the procedure to be used at the hearing, it is the APA that contains general language, requiring only that the agency conduct a "public hearing" in certain circumstances. *See* APA § 2001.029. The Code, on the other hand, contains more specific hearing procedures. *See* Code §§ 85.049, .050. As to when a hearing is required, the APA provides that a hearing must be held only under certain limited circumstances. *See* APA § 2001.-029(b). Pursuant to the Code, on the other hand, a hearing appears to be a prerequisite for any action by the Commission to protect correlative rights. *See* Code §§ 85.049, .051,

.053(a). Thus, it is possible to comply with both sets of statutory requirements.

Moreover, rulemaking and contested-case proceedings are not mutually exclusive under the APA. As Professor Schenkkan has noted,

> Those who believe that APTRA [the APA] contested cases and rulemaking are mutually exclusive are simply wrong....
>
> . . . .
>
> ... Texas agencies can and do make rules in hybrid proceedings. For nearly sixty years now the Railroad Commission has made field rules using contested case procedures. Field rules are intended to prevent waste, e.g., from too rapid drawdown of reservoir pressure, and to protect "correlative rights," meaning each operator's opportunity to share in the permissible production, in a particular field. The Commission uses contested-case procedures, allowing parties to conduct discovery, present testimony, and cross-examine opposing parties' witnesses. Yet at the end the Commission issues rules of general applicability binding on all operators in a field, whether they participated in the hearing, or merely had notice of it, or even commenced operations in the field after the rules are adopted.

Peter Schenkkan, *Judicial Review of Agency Rules & Actions Under APTRA Section 12,* State Bar of Texas 5th Annual Advanced Administrative Law Course at U–6 to U–7 (1993). Thus, there is nothing in the APA preventing an agency from employing contested-case procedures in promulgating rules. Indeed, the APA expressly provides that its purpose is only to establish *minimum* procedural requirements, not to force every agency to promulgate rules and resolve contested cases in precisely the same way: "It is the public policy of the state through this chapter to: (1) provide *minimum standards* of uniform practice and procedure for state agencies...." APA § 2001.001 (emphasis added).

---

8. Although the purpose of a rulemaking proceeding is essentially investigative rather than adjudicative, we perceive no reason why there should be only a single manner in which a factual investigation may be conducted. An evidentiary, trial-type hearing is clearly one way to investigate facts.

Finally, it does not appear to be *necessary*, in order to carry out its other functions, for the Commission to promulgate rules through a procedure that does not utilize an evidentiary hearing. First, as noted above, the Commission has used trial-type special hearings to protect correlative rights for nearly sixty years. Second, as we have tried to point out above, because correlative rights involve primarily private property rights, it is *appropriate* to give interested parties a greater degree of procedural safeguards. Third, we think it significant that the Commission has not asserted at any level of this proceeding that its long-used special hearing procedure is inadequate to protect correlative rights.

We conclude, therefore, that there is not a positive repugnance between the relevant provisions of the Code and those of the APA, and that those provisions are easily harmonized by construing the APA to mandate only minimum procedures, not uniform procedures. Accordingly, we conclude that the Commission must, in order to promulgate rules for the purpose of protecting the correlative rights of oil producers, comply with the procedural requirements of both statutes. Because the Commission failed to comply with the Code's requirement to conduct a special hearing—i.e., an evidentiary, trial-type hearing—it acted outside its statutory authority in promulgating Rule 90(b)(2) for the purpose of protecting correlative rights. As to the Commission's protection-of-correlative-rights basis, therefore, we do not address the trial court's procedural, constitutional, and other statutory-authority grounds for declaring Rule 90(b)(2) invalid.

## II. Prevention of Waste

■ Having concluded that Rule 90(b)(2) cannot be upheld on the protection-of-correl-ative-rights basis, we must now determine whether the rule can be upheld on the basis of prevention of waste.

In point of error four, the Commission complains of the trial court's conclusion that Rule 90(b)(2) was invalid due to the Commission's failure to comply with the procedural requirements of the APA. In conclusion of law four, the trial court concluded that "Railroad Commission Rule 90(b)(2) was not adopted in substantial compliance with the Administrative Procedure and Texas Register Act because it lacks a reasoned justification." As stated earlier, the requirement of a "reasoned justification" comes from section 2001.033 of the APA, which requires that an agency order finally adopting a rule must include "a reasoned justification of the rule, including . . . a restatement of the rule's factual basis." [9]

■ Although he originally recommended that a substantial-evidence standard be used in a reasoned-justification review, Professor Beal now advises that "[t]he better view is to conduct a review under an arbitrary and capricious standard." *See* Beal (II), *supra,* at 38–39 n. 161. We agree. The substantial-evidence test, whether "pure substantial evidence" or the hybrid "substantial evidence-de novo," historically has been applied to a formal evidentiary record developed in a quasi-judicial proceeding. As it is currently fashioned, the APA provides for the creation of only a minimal "record" in rulemaking proceedings: the agency order adopting the rule.[10] It would be difficult, if not impossible, to apply the traditional substantial-evidence test to such a record. We think it more appropriate, therefore, for a court to apply an "arbitrary and capricious" standard in determining whether an agency order has substantially complied with the section–.033

---

9. Even before the reasoned-justification requirement was added in 1981, the original version of the APA provided in part as follows:

On adoption of a rule, the agency, if requested to do so by an interested person either prior to adoption or within 30 days after adoption, shall issue a concise statement of the principal reasons for and against its adoption, incorporating in the statement its reasons for overruling the considerations urged against its adoption.

1975 Tex.Gen.Laws 136, 138 (since repealed and recodified as APA § 2001.030).

10. Section .033 does not require that the actual "evidence" on which the agency relied in promulgating a rule be preserved. Even if preserved, it is problematic whether such evidence would be admissible in court in a reasoned-justification challenge. That question does not arise under the circumstances of the present case.

requirement of stating a "reasoned justification of the rule, including ... a restatement of the rule's factual basis." Indeed, one commentary advocates the application of that standard in *all* judicial review of agency rules:

> [U]se of the arbitrary and capricious test as the yardstick with which to measure agency rulemaking is more suitable to that particular administrative process than the substantial evidence test, which was developed for use in reviewing quasi-judicial agency action. In applying such a standard, the courts insist upon an explanation of the facts and policy concerns relied upon by the agency, determine whether the agency has considered the relevant factors, and ensure that the agency has given the problem a "hard look" and engaged in reasoned decision making.

John J. Watkins & Debora S. Beck, *Judicial Review of Rulemaking Under the Texas Administrative Procedure and Texas Register Act*, 34 Baylor L.Rev. 1, 32–33 (1982) (footnote omitted); *cf. Starr County v. Starr Indus. Servs., Inc.*, 584 S.W.2d 352, 355–56 (Tex.Civ.App.—Austin 1979, writ ref'd n.r.e.) (explanation of arbitrary-and-capricious standard in contested-case context). Accordingly, in the present case we will review the adequacy of the Commission's "reasoned justification" under an arbitrary-and-capricious test.

 We agree with Professor Beal that section .033 of the APA places a threefold duty on agencies desiring to promulgate rules:

> (1) the agency has an *affirmative duty* to create a "legislative record" that summarizes the evidence presented during the comment period; (2) the agency has an *affirmative duty* to set forth a contemporaneous justification *based on the evidence before them* for the rule adopted including why the agency gave less weight or disregarded evidence to the contrary; and (3) the agency has an *affirmative duty* to demonstrate that the justification is a reasoned one.

Beal (II), *supra*, at 11–12 (footnote omitted). Thus, unlike a constitutional challenge to an agency rule, wherein all facts necessary to support the rule are presumed, we will review the Commission's written order "straight up" to determine whether it satisfies the affirmative duties imposed on the Commission by section .033.

 We next note that an agency's statement "substantially complies" with the reasoned-justification requirement if it "(1) secure[s] the legislative objectives that underlie the requirement and (2) come[s] fairly within the character and scope of each action or thing explicitly required by the statute in terms that are concise, specific, and unambiguous." *Methodist Hosps.*, 798 S.W.2d at 654. The legislative objectives of section .033 are as follows:

> The essential objective of the reasoned justification standard is to give notice of the factual, policy, and legal basis for the rule, as adopted or construed by the agency, in light of all the evidence gathered by the agency and submitted by interested parties during the comment period. This overall objective can be broken down into two fundamental goals of the reasoned justification requirement: (1) to ensure the agency fully considered the comments submitted and (2) to provide the factual basis and rationality of the rule as determined by the agency.

Beal (II), *supra*, at 23 (footnotes omitted). The oil companies in the present case do not focus their challenge on the adequacy of the Commission's responses to comments submitted by interested parties. Accordingly, the central issue is whether the Commission's statement is sufficient to satisfy the objective of explaining the rationality and factual basis of Rule 90.

 As stated earlier, section .033 requires that an agency order finally adopting a rule must contain "a reasoned justification of the rule, *including* " certain specified elements or components: (1) a summary of comments, with certain information about the commentors; (2) a restatement of the rule's factual basis; and (3) the reasons why the agency disagrees with party submissions and proposals. APA § 2001.033. We conclude that the requirement in section .033 that an order finally adopting a rule state a "reasoned justification" is independent of the re-

quirement that the order include specified elements. It is well settled that the term "including" is generally employed as a term of enlargement rather than a term of limitation or restriction. *Republic Ins. Co. v. Silverton Elevators, Inc.*, 493 S.W.2d 748, 752 (Tex.1973); *Peerless Carbon Black Co. v. Sheppard*, 113 S.W.2d 996, 997–98 (Tex.Civ. App.—Austin 1938, writ ref'd). We conclude that it was so employed in section .033. Thus, an agency's order does not necessarily state a reasoned justification merely because it contains the minimum components. Rather, it must satisfy the reasoned-justification requirement independently of the requirement to include the specified components.

 Further, in part because we have held that evidence outside the four corners of the agency order may not be considered in the type of reasoned-justification challenge presented here, we think the legislative objectives of the statute dictate that the order must present the agency's justification in a relatively clear, precise, and logical fashion. Otherwise, even an order stated in terms that were vague, ambiguous, conclusory, or logically incomplete or inconsistent would be virtually unassailable. We agree with Professor Beal that

the test of substantial compliance should not allow an agency to "fill in the blanks" with meaningless rhetoric and thereby frustrate the legislative intent of reasoned decision making. The legislative intent undisputably requires a focused analysis by the agency of all relevant factual, policy and legal issues resulting not only in a justification, but a *reasoned* justification of the rule.

Beal (I), *supra*, at 668 (footnote omitted). And we agree with Professor Schenkkan that

[t]he texts of Sections 5 and 12 [APA §§ 2001.033, .038] call for a determination of whether the agency's justification of its rule is, under the circumstances, adequately "reasoned." In the ordinary sense of the words, and in the context of Section 5,

this is a stiffer test than whether any sane person ignorant of the facts might consider the justification "rational." For a century, the Texas legislature has emphasized its intent that courts scrutinize an agency's decision more carefully than the constitution requires for review of a legislative decision.

Schenkkan, *supra*, at U–23. Accordingly, we think the requirement to state a reasoned justification is more than simply a requirement to demonstrate the minimum rationality of the rule.[11]

We turn now to the Commission's order in the present case. The portion of the order dealing with prevention of waste sets forth the Commission's rationale as follows:

Although the commission believes § 85.058 [of the Natural Resources Code] requires the commission to promulgate Rule 90, the adoption of this rule is not based solely on that consideration. The commission believes the rule is necessary to prevent waste and protect correlative rights as discussed below, regardless of whether or not the rule's adoption is required by § 85.058.

. . . .

With respect to the East Texas Field, the Commission has regulated that field at a [sic] 86% factor since March 1972 as well. The level was originally established to prevent waste. Eighteen years of production at the 86% factor has resulted in an efficient recovery of oil from the field. Several administrative hearings, separate from the statewide hearings, have been held regarding waste considerations since the factor was first established. However, the factor has remained the same because no commission order or rule changing the factor has been adopted. Today, there are concerns that raising allowables above the 86% level would increase the potential for waste. A non-uniform water encroachment increases the likelihood that coning, channeling, and fingering will occur. The

11. "Justify" is defined as "to prove or show to be valid, sound, or conforming to fact or reason: furnish grounds or evidence for."

"Reasoned" is defined as "1. based on or marked by reasoning . . . 2. provided with or marked by the detailed listing or mention of reasons."
*Webster's Third New International Dictionary* 1228, 1892 (Philip B. Gove ed., 1986).

non-uniformity of the water encroachment is due to differences in the reservoir composition and disparity in production rates. The East Texas Field is a large, unique field. Within the field are specific areas with different reservoir and producing characteristics. Therefore, whether waste will occur in specific areas must be evaluated on a case by case basis, which would be accomplished in an administrative hearing pursuant to Rule 90(d).

Pursuant to section 2001.030 of the APA, the oil companies timely requested an additional statement of reasons for the Commission's adoption of Rule 90, but the statement issued by the Commission added nothing to what was already in the final order.

The order initially places full authority for its adoption on section 85.058 of the Code, which provides:

> From time to time, the commission shall inquire into the production, storage, transportation, refining, reclaiming, treating, marketing, and processing of oil and gas, and reasonable market demand for oil and gas, so that it may determine whether or not waste exists or is imminent or whether the oil and gas conservation laws of this state or the rules and orders of the commission promulgated under those laws are being violated.

Code § 85.058. Even if section 85.058 helps support the Commission's general decision to use the rulemaking process for the purpose of preventing waste, it does not eliminate the Commission's statutory duty to set forth a reasoned justification for the rule that was actually adopted. Thus, section 85.058, standing alone, does not satisfy the requirement for a statement of a reasoned justification of Rule 90(b)(2).

Moreover, we do not consider the mere fact that an 86% factor has been used in the East Texas Field since 1972 as adequate justification for that decision. The order makes no comparison, for example, between the efficiency of oil recovery achieved at 86% and the efficiency that would be achieved using a higher or lower factor. Such a lack of analysis leaves this rationale with no substance, and is equivalent to a naked statement that 86% was adopted "because that's

what it's always been." The etherealness of this portion of the Commission's order is captured in its tautological conclusion on the subject: "[T]he factor has remained the same because no commission order or rule changing the factor has been adopted." This explanation is no justification at all, much less a reasoned one.

The order then proceeds to a rationale with more potential: "Today, there are concerns that raising allowables above the 86% level would increase the potential for waste." Read closely, however, this watered-down statement does no more than raise the possibility that increasing the production factor above 86% might be related to waste.

The order continues, "A non-uniform water encroachment increases the likelihood that coning, channeling, and fingering will occur." This statement, while intriguing, provides (1) no logical nexus between prevention of waste and coning, channeling, and fingering; (2) no logical nexus between prevention of waste and the 86% production factor; and (3) no logical nexus between the 86% production factor and coning, channeling, and fingering.

The order next states: "The non-uniformity of the water encroachment is due to differences in the reservoir composition and disparity in production rates. The East Texas Field is a large, unique field. Within the field are specific areas with different reservoir and producing characteristics." These statements adequately link the East Texas Field with the phenomenon of non-uniform water encroachment, but they do little else. They still provide no connection between prevention of waste and coning, channeling, and fingering, no connection between prevention of waste and the 86% production factor, and no connection between the 86% production factor and coning, channeling, and fingering. Indeed, they seem to cast doubt on the existence of such a connection: even assuming that non-uniformity of water encroachment and the resulting coning, channeling, and fingering are in fact causally related to waste, the statements indicate that such phenomena are produced by conditions—differences in the reservoir composition and disparity in production rates—that would not be

affected by the Commission's production factor.[12]

A reader of the Commission's order, already befuddled by the absence of any stated nexus between the characteristics of the East Texas Field, the goal of preventing waste, and the 86% production factor, is truly set adrift by the order's final pronouncement on the prevention-of-waste rationale: "Therefore, whether waste will occur in specific areas must be evaluated on a case by case basis, which would be accomplished in an administrative hearing pursuant to Rule 90(d)." The order is supposed to be stating a reasoned justification why an 86% production factor will prevent waste in the East Texas Field, yet the relevant section concludes with the observation that whether waste will actually occur can only be determined on a case by case basis in specific areas of the field.

When the wheat of the Commission's order is separated from its chaff, virtually all that remains is the general conclusion that the Commission believes Rule 90(b)(2) is necessary to prevent waste. Without a statement of reasons how or why the rule will accomplish this purpose, however, such conclusory statements do not "secure the legislative objectives that underlie the requirement[s]" of section .033 as set out above. *See Methodist Hosps.*, 798 S.W.2d at 654. "Prevention of waste" is simply one of a few general purposes for which the Commission is expressly authorized to promulgate rules. But the APA independently requires that an agency order adopting a rule contain "a concise restatement of the particular statutory provisions under which the rule is adopted and of how the agency interprets the provisions as authorizing or requiring the rule." APA § 2001.033(2). If the legislature had intended for general references to a statutory ground to be sufficient under section .033(1), there would have been no need to require a "reasoned justification" of the rule. We agree with Professor Beal that "bare or naked statutory findings should be held to be insufficient." Beal (II), *supra*, at 32 n. 147.

We conclude that, as to the prevention-of-waste basis for Rule 90(b)(2), the Commission's order does not substantially comply with the APA's requirements to state a reasoned justification of the rule and to state the rule's factual basis. As to prevention of waste, therefore, we do not address the trial court's constitutional and statutory-authority grounds for declaring the rule invalid. We overrule point of error four.

## CONCLUSION

Having overruled the Commission's points of error one, three, four, and six, we need not address points of error two and five. Because neither prevention of waste nor protection of correlative rights has survived as a basis for upholding the validity of Rule 90(b)(2), the judgment of the trial court is affirmed.

---

12. The phrase "disparity in production rates" is not explained, but presumably refers to disparity *between wells in a single pool,* rather than to disparity *between different pools.* In any event, if the phrase has anything to do with waste or the 86% production factor, the order establishes no such relationship.