SWB&PUC 



TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-94-00408-CV







Public Utility Commission of Texas and Southwestern Bell 


Telephone Company, Appellants



v.



Allcomm Long Distance, Inc., Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT


NO. 94-06509, HONORABLE JOSEPH HART, (1) JUDGE PRESIDING







 Appellee Allcomm Long Distance, Inc. ("Allcomm") filed suit against appellants
Southwestern Bell Telephone Company ("Southwestern Bell") and the Public Utility Commission
(the "Commission"), seeking a declaration that the Commission's final order in Docket Number
10127 (the "Order") was void. Allcomm also sought an injunction prohibiting its enforcement. 
The trial court granted Allcomm's declaratory relief and temporary injunction. Southwestern Bell
and the Commission appeal, alleging that the Order was not void and that the court lacked
jurisdiction to hear Allcomm's suit. We will reverse the trial court's judgment.



BACKGROUND


 Local exchange companies ("LECs"), such as Southwestern Bell, provide a
telecommunications service referred to as "access service" to interexchange carriers ("IXCs"),
such as AT&T, MCI, and Sprint. Allcomm is one of approximately three hundred IXCs
registered in Texas that handle the routing of calls exchanged between long distance areas.

 Pursuant to the AT&T divestiture, Southwestern Bell is not permitted to handle
long distance telephone calls. The access service LECs like Southwestern Bell provide, however,
is necessary for the origination and termination of long distance calls. Access service involves
the IXCs' use of the LECs' local exchange telephone networks to connect long distance calls. 
Both intrastate and interstate calls can cross long distance boundaries. (2) For example, a call may
originate in Austin, requiring the access service of a LEC in Austin, and be transported long
distance by an IXC to Dallas, where the access service of another LEC is needed to terminate the
call.

 Access service charges are regulated at the federal level by the Federal
Communications Commission ("FCC") and at the state level by the Commission. The FCC has
regulatory jurisdiction over all interstate telecommunications, while the Commission has
regulatory jurisdiction over all intrastate telecommunications. (3) The result is two different rate and
tariff structures. The FCC-approved access service tariff for interstate calls averages 3.1 cents
per minute of use. This is the amount that an LEC like Southwestern Bell is permitted to charge
an IXC like Allcomm for the access service necessary to originate a call that terminates in a
different state or to terminate a call that originates in a different state. For example, on an
interstate call originating in Oklahoma City, Oklahoma and terminating in Austin, Texas, the LEC
in each city is permitted to charge the IXC 3.1 cents for each minute of the call.

 In contrast, the Commission-approved access service tariff for intrastate calls
averages 6.9 cents per minute of use, more than double the interstate rate. The Commission has
intentionally set intrastate access-service tariffs above cost to assist the LECs in making basic
telephone service more affordable for all customers. For an intrastate call from Dallas to Austin,
for example, the LEC at each end of the call charges the IXC 6.9 cents for each minute of the
call. In the example above, the LEC bills and the IXC pays the access service tariffs for both
origination and termination of the call, for a total of 13.8 cents per minute.

 In certain instances, the LECs are unable to determine whether an incoming call
originated in Texas. Likewise, in certain instances the LECs are unable to determine whether an
outgoing call is destined for a point of termination in Texas or in another state. LECs thus have
experienced some difficulty in determining whether to apply the FCC's interstate tariff or the
Commission's intrastate tariff. IXCs, however, are able to capture the data necessary to establish
whether calls are interstate or intrastate. Consequently, both the FCC and the Commission
require IXCs to "self-report" the percentage of their calls that are interstate through a figure called
the "Percent Interstate Usage (PIU)." (4) Due to the significantly lower FCC access service rates
for interstate calls as compared to the Commission's access service rates for intrastate calls, IXCs
are presented with an opportunity for substantial cost savings by overstating their percentage of
interstate calls. (5)



 PROCEDURAL HISTORY


 To provide guidance to the LECs in proposing tariffs that ensure accurate billing,
the Commission adopted Rule 23.23(d)(7). See 16 Tex. Admin. Code § 23.23(d)(7) (1995). (6) The
rule's purpose was to "give ample guidance to the industry as it proposes tariffs to further ensure
accurate access billing." 17 Tex. Reg. 2981, 2986 (1992). The rule required Southwestern Bell
to file an intrastate access service tariff proposal within sixty days, and it required all other LECs
to file revisions to their tariffs' PIU provisions to mirror that of Southwestern Bell within thirty
days of the proposal. The rule provided guidelines for allowing IXCs to self-report PIUs when
the LECs were unable to determine the location of the access service used, but did not specify a
method for monitoring and auditing the self-reported PIUs.

 Southwestern Bell proposed a tariff that was docketed as a contested case before
the Commission under Docket Number 10127. Direct notice was sent to all IXCs registered with
the Commission and all LECs in Texas, and notice of the hearing was published in the Texas
Register. Allcomm was given notice of the hearing, but chose not to participate. (7) The parties to
the contested case hearing entered a non-unanimous stipulation (8) resolving disputed issues, and the
Commission approved this stipulation in its Order.

 The cornerstone of the stipulation and the Order was the creation of two industry
committees "to administer uniform and nondiscriminatory PIU reporting requirements and audit
procedures: (1) a PIU Committee and (2) an Audit Committee." All LECs and IXCs could
participate as members of the PIU Committee. All LECs except those affiliated with an IXC
could participate as members of the Audit Committee. The PIU Committee and the Audit
Committee perform separately defined duties to accomplish the auditing of the IXCs' PIU
reporting. 

 Although it had not participated in the contested case hearing, Allcomm filed suit
in district court, alleging that the Order was void as an unauthorized delegation of regulatory
power and responsibility by the Commission to private entities under the Public Utility Regulatory
Act of 1995, 74th Leg., R.S., ch. 9, Tex. Sess. Law Serv. 31 (West) (hereinafter "PURA"). (9) 
Allcomm sought a declaratory judgment that the Order was void and an injunction prohibiting its
enforcement. Allcomm conceded that it participated in neither the making of Rule 23.23 nor the
hearing for Docket Number 10127, and that it filed no motion for rehearing or suit for judicial
review of the Order before the Commission. The trial court granted Allcomm's petition for
equitable relief at a temporary injunction hearing. The parties agreed to treat the temporary
injunction hearing as a trial on the merits and the trial court rendered a final judgment. The
Commission and Southwestern Bell appeal.



DISCUSSION


 In its first point of error, the Commission contends that the district court erred in
failing to grant its plea to the jurisdiction. In points of error three, four, five, and six,
Southwestern Bell more specifically argues that the district court erred in concluding it had
jurisdiction because (1) the Order does not violate PURA and, therefore, the Uniform Declaratory
Judgments Act, Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001-.011 (West 1986 & Supp. 1995),
does not empower Allcomm to bring a declaratory judgment action; (2) the suit constitutes an
impermissible collateral attack on an agency order because Allcomm did not comply with the
procedural requirements of the Administrative Procedures Act ("APA"), Tex. Gov't Code Ann.
§§ 2001.171-.178 (West 1995); and (3) while APA section 2001.038 permits a suit for declaratory
judgment to challenge an agency rule by anyone whose rights are affected by the rule, Allcomm
did not invoke or seek relief under this provision nor did it challenge a an agency rule.

 To determine whether the district court correctly exercised jurisdiction, we must
initially evaluate whether Allcomm's collateral attack on the Commission's Order was permissible. 
Generally, an agency's final order, like the final judgment of a court of law, is immune from
collateral attack. See Alamo Express, Inc. v. Union City Transfer, 309 S.W.2d 815, 827 (Tex.
1958) (concluding that collateral attack on Railroad Commission order was impermissible because
administrative statutes provided sole method of attack). An aggrieved party in a PURA
proceeding can directly attack an agency decision in a suit for judicial review only if it follows
the procedural requirements of the APA. PURA § 1.005; see Southwestern Bell Tel. Co. v.
Public Util. Comm'n, 571 S.W.2d 503, 507-08 (Tex. 1978). However, since administrative
bodies are entitled to exercise, without interference from courts, only those functions conferred
by statute, a trial court's intervention in an administrative proceeding may be permissible when
an agency's actions exceed its statutory authority. Westheimer Indep. Sch. Dist. v. Brockette, 567
S.W.2d 780, 785 (Tex. 1978). Therefore, a well-recognized exception to the rule that agency
actions are normally immune from collateral attack occurs when an agency acts beyond the scope
of its statutorily conferred powers; a suit for declaratory or injunctive relief will lie in such a
situation. Gulf States Utils. Co. v. Coalition of Cities for Affordable Util. Rates, 883 S.W.2d
739, 743-44 & n.4 (Tex. App.--Austin 1994, writ requested). Furthermore, the doctrine of
exhaustion of administrative remedies is not applicable when an agency acts outside its statutory
authority. Westheimer, 567 S.W.2d at 785. 

 In the present case, Allcomm sought a declaration that the Commission lacked the
authority to establish and delegate power to the PIU and Audit Committees. These allegations fit
plainly within the exception described above, and Allcomm's collateral attack was proper. 
Accordingly, we overrule the Commission's first point of error and Southwestern Bell's third,
fourth, fifth, and sixth points of error. Having concluded that the district court did not improperly
interfere with the administrative process by entertaining Allcomm's collateral attack, we now turn
to the trial court's decision on the merits.

 In the Commission's second point of error and in Southwestern Bell's first, second,
and eighth points of error, the Commission and Southwestern Bell contend that the trial court
erred in concluding that the Commission's Order involved an unlawful delegation. They assert
that the Order merely approved a procedure that Southwestern Bell was entitled to implement as
a private entity under the common law. 

 Allcomm responds that the Commission lacked the authority to delegate regulatory
power to the PIU and Audit Committees, noting that an agency is not permitted to "erect and
exercise what really amounts to a new and additional power or one that contradicts the statute, no
matter that the new power is viewed as being expedient for administrative purposes." Sexton v.
Mount Olivet Cemetery Ass'n, 720 S.W.2d 129, 138 (Tex. App.--Austin 1986, writ ref'd n.r.e.). 
Allcomm asserts that PURA section 3.051(b), which grants the Commission exclusive jurisdiction
over the business and property of all telecommunications utilities in Texas, contains no provision
that allows the Commission to delegate its power. See PURA § 3.051(b). Because the parties
have taken fundamentally different positions as to the nature of the Commission's actions in this
proceeding, the central issue for this Court to resolve is whether the Commission's Order involved
an approval of the creation of the committees or an unlawful delegation of regulatory power by
the Commission to the PIU and Audit Committees.

 In its Order, the Commission adopted the proposal to create the Audit and PIU
Committees. The Commission specifically concluded that "[t]he reporting requirements, auditing
standards, and backbilling procedures in the stipulation and proposed tariff sheets are reasonably
calculated to result in a more accurate allocation of revenues and costs between the intrastate and
interstate jurisdictions for switched access services." Southwestern Bell and the Commission
contend that the Commission's adoption of the stipulation and the proposed tariff merely
represents the Commission's approval of actions that Southwestern Bell would have the inherent
power to perform but for the Commission's regulatory authority over utilities. Southwestern Bell
argues that the origin of its right to create these committees is found in the common law;
therefore, the fact that PURA does not specifically authorize the creation of such committees is
not dispositive. In essence, Southwestern Bell asserts that despite extensive regulation, it remains
a private entity with the power to resolve disputes such as the PIU reporting in any manner it sees
fit, subject only to the approval of the Commission. 

 Under PURA, the Commission has authority to "fix and regulate rates of public
utilities, including rules and regulations for determining the classification of customers and
services and for determining the applicability of rates." PURA § 2.201. The Commission has
a duty to ensure that every rate made, demanded, or received by the public utility is just and
reasonable. Id. § 2.202. The term "rate" includes every compensation, tariff, charge, toll, rental,
classification, and "any rules, regulations, practices, or contracts affecting any such
compensation, tariff, charge, fare, toll, rental, or classification." Id. § 1.003(14) (emphasis
added). PURA clearly intends that the Commission have the authority to oversee and approve the
actions of a regulated utility. This ability to approve, however, does not transform every activity
of a utility into action that the Commission is statutorily required to regulate.

 The Supreme Court, in concluding that all activities of a utility do not constitute
state action for purposes of the Fourteenth Amendment, noted that "[t]he mere fact that a business
is subject to state regulation does not by itself convert its action into that of the State . . . . Nor
does the fact that the regulation is extensive and detailed, as in the case of most public utilities,
do so." Jackson v. Metropolitan Edison Co., 419 U.S. 345, 350 (1974) (citation omitted). In
Jackson, a Pennsylvania tariff included a provision allowing the utility to terminate for non-payment; Jackson sued after her service was terminated, arguing that she had a right to notice and
a hearing because the utility's actions were state actions. The Court rejected this contention:



The nature of governmental regulation of private utilities is such that a utility may
frequently be required by the state regulatory scheme to obtain approval for
practices a business regulated in less detail would be free to institute without any
approval from a regulatory body. Approval by a state utility commission of such
a request from a regulated utility, where the commission has not put its own weight
on the side of the proposed practice by ordering it, does not transmute a practice
initiated by the utility and approved by the commission into "state action."



Id. at 357 (emphasis added).

 This Court has also recognized that the Commission leaves the utility discretion in
the development of tariffs:



[T]he agency will direct the utility to file new tariffs, leaving the determination of
the specific tariff or rate schedule . . . for the utility, subject to approval by the
agency. . . . The proposal of tariff rates is left to the utility because, in general,
the utility is thought to know more about the proper criteria than either agency staff
or opposition experts and, therefore, is better able to allocate burdens between
classes of consumers.



Texas Ass'n of Long Distance Tel. Cos. (TEXALTEL) v. Public Util. Comm'n, 798 S.W.2d 875,
883 (Tex. App.--Austin 1990, writ denied) (emphasis added) (citations omitted). This is exactly
what happened in the instant cause. Southwestern Bell filed its tariff, which addressed the
problem of inaccurate PIU reporting, and then, to avoid the expense of a contested case hearing,
entered into a stipulation with the IXCs as to the least offensive method for resolving the reporting
problem. The Commission subsequently approved the tariff, apparently because it concluded that
the tariff and accompanying stipulation were just and reasonable. See PURA § 2.202;
TEXALTEL, 798 S.W.2d at 883.

 Following the reasoning of the Supreme Court, we conclude that although the
Commission's approval of the creation of the committees was required, its approval did not
constitute an unlawful delegation of its power to regulate IXCs under PURA. Indeed, all parties
concede that PURA does not give the Commission the inherent authority to audit IXCs to
determine whether they are underreporting their percentage of intrastate usage. The sole extent
of the Commission's authority to regulate IXCs is contained in section 3.051(c), which does not
include many of the powers that the Audit and PIU Committees have been given. See PURA §
3.051(c). The trial court, however, incorrectly assumed that the Commission improperly
delegated its authority to the committees. We agree with the Commission and Southwestern Bell's
assertion that the LECs' authority to audit IXCs originates not in PURA, but in the common law. 
The mere fact of extensive regulation does not strip a utility of all legal rights except those
conferred by PURA. Southwestern Bell remains a private entity, despite the fact that it performs
services that are "affected with a public interest." See Jackson, 419 U.S. at 354. The
Commission's approval of the stipulation between the IXCs and the LECs does not constitute an
unlawful delegation of agency power. The LECs could clearly audit the IXCs' usage under the
common law; the Commission's regulation of LECs does not abrogate this right to audit. The
trial court therefore erred, and we sustain the Commission's second point of error and
Southwestern Bell's first, second, third, and eighth points of error. (10)

 In its seventh point of error, Southwestern Bell contends that the trial court erred in
concluding that the Order mandated binding arbitration. The trial court determined that the Order
would compel Allcomm "to submit disputes to binding arbitration or to the Audit Committee for
resolution, which would deprive Plaintiff of access to the courts." The Order provides:

Within 30 days of receipt of the audit, the IXC and any affected LEC may
challenge the conclusions reached in an initial audit. Any such challenge will be
processed in one of two ways: (1) the Audit Committee will review the facts and
recommend a resolution or (2) the matter will be referred to binding arbitration
upon the agreement of the affected parties.



(Emphasis added.) We agree with Southwestern Bell that the optional nature of the binding
arbitration is clear from the face of the order. The matter is referred to arbitration only if all
parties involved in the dispute agree to this type of resolution. The tariff and the stipulation
provide similar evidence that binding arbitration would be used only if amenable to all affected
parties. (11) 

 We disagree with Allcomm's contention that the Order forces it to submit to
binding arbitration and to relinquish its access to the courts. Ratemaking is a legislative activity,
even when delegated to an administrative agency. See City of Alvin v. Public Util. Comm'n, 876
S.W.2d 346, 362 (Tex. App.--Austin 1993), writ granted w.r.m., 893 S.W.2d 450 (Tex. 1994);
see also Railroad Comm'n v. Houston Natural Gas Corp., 289 S.W.2d 559, 562 (Tex. 1956). 
As with any other statute or legislative enactment, a court must construe an agency action in a
manner that renders it constitutional if possible to do so by a reasonable interpretation of the
Order's language. See Trinity River Auth. v. URS Consultants, Inc.--Tex., 869 S.W.2d 367, 370
(Tex. App.--Dallas 1993), aff'd, 889 S.W.2d 259 (Tex. 1994). Therefore, because the Order
could be reasonably interpreted as not denying Allcomm access to the courts, the trial court erred
in concluding that it mandated binding arbitration and was therefore invalid. We sustain
Southwestern Bell's seventh point of error.



CONCLUSION 


 The trial court erred in concluding that the Commission had exceeded its statutory
authority by approving the creation of the PIU and Audit Committees to supervise IXCs' reporting
of interstate usage and in finding that the Order mandated binding arbitration. Because of our
disposition of this matter, we need not address Southwestern Bell's ninth and tenth points of error. 
We reverse the trial court's judgment, and render judgment that the Commission's Order in
Docket 10127 is enforceable against Allcomm.



 Mack Kidd, Justice

Before Justices Powers, Jones, and Kidd

Reversed and Rendered

Filed: June 21, 1995

Publish 
1. [1]  In reviewing the record, we note that the Honorable Hume Cofer apparently presided
over the trial on the merits, the Honorable Paul Davis signed the final judgment and order
granting the permanent injunction "for Hume Cofer," and the Honorable Joseph Hart signed
the severance order that made this cause final and appealable.
2. [2]  The boundaries separate the seventeen areas in Texas referred to as "local access
transport areas." 
3. [3]  The Federal Communications Act exempts intrastate matters, leaving their regulation to
state utility commissions. 47 U.S.C § 152(b) (1988 & Supp. 1991).
4. [4]  The PIU (Percentage of interstate usage) subtracted from one hundred percent equals the
percentage of intrastate calls. For instance, if an IXC reports a PIU of forty percent, the
corresponding intrastate usage would be sixty percent.
5. [5]  For example, if 300,000 minutes of use a month are misreported as interstate (3.1
cents/minute) rather than intrastate (6.9 cents/minute) calls, the cost savings to an IXC would
be $20,700 minus $9,300, or $11,400 a month.
6. [6]  Rule 23.23(d)(7)(A) provides:


Percent interstate usage (PIU). Within 60 days of the adoption of this subsection,
Southwestern Bell Telephone Company shall file its compliance tariff regarding
PIU provisions. Within 30 days of adoption by the commission of amended PIU
reporting, auditing, and backbilling procedures for Southwestern Bell Telephone
Company, all independent LECs must file administrative revisions to their
intrastate access service tariffs to mirror the PIU provisions in the intrastate
access service tariff of Southwestern Bell . . . .
7. [7]  Contrary to Allcomm's assertion that its failure to participate is irrelevant because it
received no notice that the Commission would adopt the stipulation's provisions that created
the Audit and PIU Committees, we believe that Allcomm received adequate notice to apprise it
of the parties' intent to consider auditing procedures. Southwestern Bell's letter to Allcomm
indicated that several issues would be discussed in the proceeding, including: (1) the
appropriate scope of auditing procedures by LECs of IXCs' reported PIUs; (2) reporting,
auditing, and verification (including the customers' obligation to maintain detailed records);
(3) the scope of backbilling when LECs' auditing has determined that PIUs are erroneous; and
(4) the steps which may be taken by an LEC in the event of an IXC's noncompliance. Given
that its complaints about the committees could have been raised before the Commission and
that it received sufficient notice, Allcomm's failure to take part in the contested case
proceeding weakens its position before this Court.
8. [8]  Although characterized as non-unanimous, every party joined the stipulation except the
Office of Public Utility Counsel ("OPUC"), which did not oppose the agreement.
9. [9]  All citations in this opinion are to the current Public Utility Regulatory Act of 1995
rather than the former Public Utility Regulatory Act, because the recent codification did not
substantively change the law. Act of Apr. 5, 1995, 74th Leg., R.S., ch. 9, sec. 3(a), 1995
Tex. Sess. Law. Serv. 31, 87 (West).
10. [10] Our conclusion that the Commission's Order creating the committees did not involve an
unlawful delegation of agency power does not deprive Allcomm of all opportunity to challenge
their creation. Allcomm can request a hearing before the Commission pursuant to section
2.211:


Whenever the regulatory authority, after reasonable notice and hearing, on its
own motion or on complaint by any affected person, finds that the existing rates
of any public utility for any service are unreasonable or in any way in violation of
any provision of law, the regulatory authority shall determine the just and
reasonable rates . . . to be thereafter observed and in force . . . .


PURA § 2.211(a); see also PURA §§ 2.214, 2.215(a). The Commission's approval of the
tariff and the stipulation does not prevent Allcomm from challenging the tariff and stipulation
before the Commission if and when its rights are adversely affected. 
11. [11] In addition, the trial court signed an order which indicated that Southwestern Bell
admitted in oral argument that the tariff does not prohibit IXCs from requesting relief through
trial courts if the matter cannot be more amicably resolved.