TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-97-00002-CV






WBD Oil & Gas Company and WBD Oil & Gas Company, Inc., Appellants



v.



Railroad Commission of Texas; Dan Morales in his Official Capacity as Attorney


General of the State of Texas; Anadarko Petroleum Corp.; MidCon Gas


Services Corp.; Natural Gas Pipeline Company of America; Midgard


Energy Company; and Conoco Inc., Appellees







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT


NO. 95-07116, HONORABLE MARGARET A. COOPER, JUDGE PRESIDING







 WBD Oil & Gas Company and WBD Oil & Gas Company, Inc. (collectively
"WBD") filed a declaratory judgment action challenging the validity of field rules promulgated
by the Railroad Commission of Texas ("Commission") for oil and gas fields in the Texas
panhandle. (1) The trial court dismissed the suit for want of jurisdiction. In a single point of error,
WBD asserts several bases for jurisdiction in a Travis County district court. We will reverse the
trial court's order of dismissal.

FACTUAL AND PROCEDURAL BACKGROUND

 In an effort to settle confusion that existed in producing the enormous oil and gas
fields of the Texas panhandle, the Commission issued notice in January 1986 of its intent to
conduct hearings for the purpose of considering the consolidation of those 13 fields into a single
"Panhandle Field" and, if consolidation was ordered, the adoption of rules for the consolidated
field. The notice stated in pertinent part:


I


 NOTICE IS HEREBY GIVEN to the public and all interested persons that
. . . the Railroad Commission of Texas will hold a hearing on a date and place to
be determined.


II


 . . . .


 [T]he Commission will consider consolidating all the Panhandle Fields into
one, the proposed "Texas Panhandle Field," and prorating this consolidated new
field as an associated reservoir.


 Operators are urged to present data and opinions as to whether the
Panhandle Lime, Granite Wash, and various other formations are a common
reservoir. . . .


 If the Panhandle Fields are consolidated into one field, the Commission will
also consider determining special field rules for regulating exploration, production,
and development in a manner necessary to prevent waste, promote conservation,
and protect correlative rights. Operators are urged to present data and opinions in
support of the special field rules they would consider to be appropriate.


 . . . .


V


 The Commission will consider adopting the following rules to govern the
development and production of all wells prorated in the proposed Texas Panhandle
Field, but will adopt rules as the evidence shows is necessary to prevent waste and
protect correlative rights:


 . . . .


VI


 Parties attending this hearing may propose other rules and/or alternative
field rules and should submit evidence to support any proposed rule as it relates to
waste prevention, oil and gas conservation, and the protection of correlative rights.


 . . . .


XII


 All persons who intend to participate in the hearing of this docket are
directed to file with Docket Services by February 4, 1986, a written Pleading
setting forth the following:


1. Their correct name and mailing address;


2. Their intent to appear;


3. Whether or not party status will be requested;


4. The basis for standing if party status is requested;


5. Their position on the issued [sic] raised in this Notice and
specifically with regard to consolidation of fields and special
field rules;


6. Whether or not they intend to present evidence at the hearing;
and,


7. Any other matter that is appropriate.


 The first matter to be considered at the prehearing conference will be the
designation of parties. Parties will be named at the prehearing conference. . . .


 An official Service List will be compiled and maintained by the Examiners. 
The Service List will contain only named parties (or their representatives) to the
hearing. A list of interested persons who do not request party status but who
request to be included for Commission generated mailings regarding this docket
will also be compiled and maintained by the Examiners. The Service List will be
updated as necessary and representatives may be designated to receive service for
more than one party. Only the parties and representative [sic] included in the latest
Service List must be served as required by Commission Rules or the procedure
directed for this docket.


WBD received this notice, but did not accept the Commission's invitation to participate in the
proceeding. At that time there were more than 15,000 producing oil or gas wells in the 13 fields
located in the Texas panhandle. WBD owned or operated forty such wells.

 Pursuant to the notice, the Commission conducted an evidentiary, trial-type hearing
commencing on January 6, 1987. The result of this hearing was the issuance in 1989 of an order
that contained findings of fact, conclusions of law, field rules for oil, field rules for gas, general
rules, and guidelines for compliance (collectively, the "Panhandle Field (2) rules"). The
Commission's order was styled "Amended Final Order Adopting and Clarifying Rules and
Regulations for [13 named oil and gas fields], Hereinafter Referred to as the 'Panhandle Fields'"
and stated in pertinent part:


 It has come to the Commission's attention that confusion exists among some
operators in the Panhandle Fields as to the applicability of the rules presently
enforced by the Commission in the administration of oil and gas conservation
matters in said fields, and more particularly in the methods of completion permitted
for oil wells. So that the existing confusion may be eliminated, the Commission,
after review and due consideration of a Proposal For Decision in Docket No. 10-87,017, and the exceptions and replies thereto, hereby adopts the following
findings of fact and conclusions of law:


FINDINGS OF FACT



* * *



 
 5. The Railroad Commission called this hearing to review existing rules and to
consider adopting new or amended rules for [13 named oil and gas fields]. 
These fields collectively are referred to as the Panhandle Fields.


CONCLUSIONS OF LAW





* * *



10. Changes and clarifications of rules in the Panhandle Fields are appropriate in
light of "changed conditions", Railroad Commission v. Aluminum Company
of America, 380 S.W.2d 599 (Tex. 1964).


* * *


 Therefore, IT IS ORDERED by the Railroad Commission of Texas that the
historic classification and separation of Panhandle oil and Panhandle gas fields shall
be retained . . . and that the following rules, in addition to such of the
Commission's general rules and regulations as are not in conflict herewith, be and
the same are hereby clarified and adopted to govern the drilling, completion and
operation of wells in the Panhandle Fields:


Oil Field Rules


* * *


Gas Field Rules


* * *


General Rules


 . . . .


Existing and future oil wells meeting one of the oil well criteria set forth in
Appendix One will be presumed to have been properly completed. Operators shall
have a period of one year to bring existing wells into compliance with an Appendix
One guideline in order to receive the presumption.


 . . . .


Existing gas wells will be presumed to have been properly completed if they meet
one of the gas well completion criteria set forth in Appendix One to the Final Order
in this docket. Operators shall have a period of one year to bring existing wells
into compliance with an Appendix One guideline in order to receive the
presumption.


 . . . .


An operator with well(s) which fail to meet any of the completion guidelines may
file an application for hearing that an exception to the field rules is necessary to
prevent waste or protect correlative rights.


 After being sued in 1994 for allegedly violating certain Commission rules, including
portions of the 1989 Panhandle Field rules, WBD filed the present lawsuit to determine the
validity and applicability of the Panhandle Field rules. In its petition, WBD sought declaratory
relief that the rules violate various state and federal statutes and constitutional provisions,
including prohibitions against retroactive laws (U.S. Const. art. I, § 10; Tex. Const. art. I, § 16),
prohibitions against contradicting or suspending law in place at the time the field rules were
promulgated (Tex. Const. art. I, § 28; Tex. Gov't Code Ann. § 481.141-143 (West 1990)), due
process and due course of law clauses (U.S. Const. amend. XIV; Tex. Const. art. I, § 19), and
separation of powers provisions (Tex. Const. art. II, § 1). The petition also alleged that the rules
denied WBD's constitutional right to equal protection under the law (U.S. Const. amend. XIV;
Tex. Const. art. I, § 3), that enforcement of these rules against WBD would be unreasonable,
arbitrary, and capricious, and that, because WBD did not participate in the proceeding establishing
the rules, they could not lawfully be applied to its wells. WBD also joined Attorney General Dan
Morales as a defendant pursuant to 42 U.S.C.A. § 1983 (West 1994) to enjoin him from enforcing
the rules as inconsistent with the laws and Constitution of the United States. The trial court
dismissed the suit for lack of jurisdiction. On appeal, WBD asserts several bases for the
assumption by a Travis County district court of jurisdiction in this case, including: the Uniform
Declaratory Judgments Act, Tex. Civ. Prac. & Rem. Code Ann. ch. 37 (West 1997); the Texas
Administrative Procedure Act, Tex. Gov't Code Ann. § 2001.038 (West 1997); Tex. Nat. Res.
Code Ann. § 85.241 (West 1993); 42 U.S.C.A. § 1983 (West 1994); and the Constitutions of
Texas and the United States.


DISCUSSION

 In determining whether a trial court has jurisdiction of a cause of action, the good-faith allegations made in the petition are determinative. Brannon v. Pacific Employers Ins. Co.,
224 S.W.2d 466, 469 (Tex. 1949); Firemen's Ins. Co. v. Board of Regents of the Univ. of Tex.
System, 909 S.W.2d 540, 541 (Tex. App.--Austin 1995, writ denied). The reviewing court
construes the pleadings in the plaintiff's favor and looks to the intent of the pleader. Texas Ass'n
of Business v. Texas Air Control Bd., 852 S.W.2d 440, 446 (Tex. 1993). Thus, we look at
WBD's pleadings to determine if the allegations assert causes of action over which a Travis
County district court has jurisdiction.

 A state district court has jurisdiction to review agency action only (1) as the result
of a specific statutory grant by the legislature, or (2) in its inherent constitutional grant of
jurisdiction in article V, section 8 of the Texas Constitution when an agency action violates a
constitutional right or adversely affects a vested property right. Stone v. Texas Liquor Control
Bd., 417 S.W.2d 385, 386 (Tex. 1967); Sells v. Roose, 769 S.W.2d 641, 643 (Tex. App.--Austin
1989, no writ). WBD asserts that the trial court here had jurisdiction on both bases.


Statutory Basis

 The most direct jurisdictional basis on which WBD relies as authorization for its
action is section 2001.038 of the Texas Administrative Procedure Act (hereinafter "APA"). See
Tex. Gov't Code Ann. § 2001.038 (West 1997). That section states in pertinent part:


(a) The validity or applicability of a rule, including an emergency rule adopted
under Section 2001.043, may be determined in an action for declaratory
judgment if it is alleged that the rule or its threatened application interferes
with or impairs, or threatens to impair, a legal right or privilege of the
plaintiff.


(b) The action may be brought only in a Travis County district court.



APA § 2001.038(a), (b). WBD argues that the Panhandle Field rules may be reviewed under
section 2001.038 because that provision allows for direct judicial review of agency "rules" and
because the Panhandle Field rules are included within the scope of that term. In response, the
Commission contends section 2001.038 does not apply to the Panhandle Field rules because they
were promulgated pursuant to the contested-case procedures of sections 2001.051-.147 of the APA
rather than the notice-and-comment rulemaking procedures of sections 2001.023-.034.

 We conclude that the trial court has jurisdiction to review the validity of the
Panhandle Field rules pursuant to APA § 2001.038 for three reasons: (1) the Panhandle Field
rules fall within the APA's definition of "rule" and meet the general requirements for an
administrative rule; (2) the proceeding through which the Panhandle Field rules were adopted does
not qualify as a "contested case" under the APA; and (3) the Commission is, in some
circumstances, statutorily required to use trial-type procedures in promulgating field rules.


I. The Panhandle Field Rules Fall Within the APA's Definition of "Rule" and Meet the
General Requirements for an Administrative Rule


 The APA defines "rule" as follows:



"Rule"


(A) means a state agency statement of general applicability that:


  (i) implements, interprets, or prescribes law or policy; or


 (ii) describes the procedure or practice requirements of a state agency;


(B) includes the amendment or repeal of a prior rule; and 


(C) does not include a statement regarding only the internal management or
organization of a state agency and not affecting private rights or procedures.



APA § 2001.003(6). Several factors lead us to conclude that the Panhandle Field rules fall within
this definition.

 First, the rules satisfy the literal requirements of the APA definition. They are
clearly an agency statement. They implement, interpret, or prescribe law or policy. And they do
not constitute statements regarding only the internal management or organization of the
Commission without affecting private rights. (3) Thus, the only requirement about which there can
be any bona fide disagreement is whether the rules constitute statements of "general applicability,"
since they do not have statewide impact but affect only the Panhandle Field.

 A variety of sources support the conclusion that the mere fact that the Panhandle
Field rules do not have statewide impact does not prevent them from being statements of general
applicability. For example, the Texas APA was modeled after the Revised Model State
Administrative Procedure Act of 1961. See Commerce Indep. Sch. Dist. v. Texas Educ. Agency,
859 S.W.2d 627, 630 (Tex. App.--Austin 1993, writ dism'd); Dudley D. McCalla, The
Administrative Procedure and Texas Register Act, 28 Baylor L. Rev. 445 (1976); see also Model
State Administrative Procedure Act (1961), 15 U.L.A. §§ 1-19 (1990). The definition of "rule"
in section 2001.003(6) of the Texas APA is substantially identical to the definition in section 1(7)
of the 1961 Model Act. (4) Significantly, the official comments to the 1961 Model Act state:


Attention should be called to the fact that rules, like statutory provisions, may be
of "general applicability" even though they may be of immediate concern to only
a single person or corporation, provided the form is general and others who may
qualify in the future will fall within its provisions.



Model State Administrative Procedure Act (1961) § 1(7) cmt., 15 U.L.A. 147, 149 (1990). The
official comments to the 1981 version of the Model Act repeat this statement. See Model State
Administrative Procedure Act (1981) § 1-102(10) cmt., 15 U.L.A. 7, 14 (1990).

 One of the foremost commentators on state administrative rulemaking agrees. 
Commenting on the definition of "rule" contained in the 1981 Model Act, which is similar to that
in the 1961 version, Professor Bonfield states:


 The phrase "the whole or a part of an agency statement of general
applicability" is probably the most important concept in the definition of "rule." 
Every statement implementing, interpreting, or prescribing law or policy that is
directed at a class by description, that is, directed at all persons similarly situated,
rather than at named individuals, is thus within the ambit of the definition. 
Statements of general applicability are to be distinguished from statements of
particular applicability, which are addressed to specified individuals rather than to
all individuals who are similarly situated.


Arthur Earl Bonfield, State Administrative Rule Making § 3.3.1, at 75 (1986) (emphasis in
original).

 In addition, this Court itself has so held. Referring to Railroad Commission Rule
90(b)(2), which we held to be a field rule "for all intents and purposes," we stated:


A "rule" is defined in the APA as "a state agency statement of general
applicability." APA § 2001.003. Although Rule 90(b)(2) does not apply to all oil
fields in the state, we believe it still can be considered to be of "general
applicability" and therefore to fall within the APA's definition of a "rule."


Railroad Comm'n v. ARCO Oil & Gas Co., 876 S.W.2d 473, 486 n.7 (Tex. App.--Austin 1994,
writ denied).

 Finally, courts of other jurisdictions also agree. The Wisconsin Supreme Court
concisely stated the proper rule as follows:


[T]o be of general application, a rule need not apply to all persons within the state. 
Even though an action applies only to persons within a small class, the action is of
general application if that class is described in general terms and new members can
be added to the class.


Citizens for Sensible Zoning Inc. v. Department of Natural Resources, 280 N.W.2d 702, 707-08
(Wis. 1979) (Abrahamson, J.); see also Grand River Dam Auth. v. State, 645 P.2d 1011, 1016
(Okl. 1982) ("As the Comment to the Revised Model Act explains, rules--like statutes--may be
of 'general applicability' even though they may be of immediate concern only to a single person,
provided that the form is general and others who may qualify in the future come within its
provisions."); Simpson Tacoma Kraft Co. v. Department of Ecology, 835 P.2d 1030, 1035 (Wash.
1992).

 Apart from the statutory definition of the term "rule," there are a number of
commonly cited general requirements of an administrative rule. See Arthur Earl Bonfield, The
Iowa Administrative Procedure Act: Background, Construction, Applicability, Public Access to
Agency Law, the Rulemaking Process, 60 Iowa L. Rev. 731, 824-26 (1975). The Panhandle Field
rules satisfy all such general requirements:

 First, the Panhandle Field rules--the relevant "agency statement" here--were not
directed at named individuals, but at a class or category described in general terms: operators of
oil and/or gas wells in the Panhandle Field. Although all operators in the Panhandle Field
apparently received individual notice of the initiation of the proceeding, even a casual glance at
the rules themselves reveals their general nature:


Oil Field Rules


Rule 1. Panhandle Field oil wells are restricted to . . . . No person in possession
of or operating an oil well may . . . .


Rule 2. No oil well shall hereafter be drilled nearer than . . . .


Rule 3. . . . . No proration unit shall consist of more than . . . . All proration
units, however, shall consist of . . . . An operator, at his option, shall be
permitted to . . . .Operators shall file . . . .


Rule 4. The top allowable for oil wells on a 20 acre unit is . . . . The maximum
daily oil allowable for each well shall be . . . .


Rule 5. An oil well shall be allowed to produce . . . .


Gas Field Rules


. . . .


Rule 2. No gas well in the Panhandle, West field shall hereafter be drilled nearer
than. . . .


Rule 3. . . . . No gas proration unit shall . . . .All such proration units shall
consist of . . . .Operators shall file . . . .


Rule 4. The daily allowable production of gas from individual gas wells
completed in the Panhandle, West and East gas fields, shall be . . . .


. . . .


Rule 6. Gas wells in the Panhandle, West field shall be . . . .


 Second, new members could be added to the class in the future. Nothing in the
Panhandle Field rules excludes from the operation of the rules new operators who drill or obtain
oil or gas wells in the Panhandle Field after the rules' adoption. It is obvious that the Commission
intended for the rules to apply to all persons who, in the future, become operators in the Panhandle
Field. This is the method by which the Commission historically has produced field rules. As one
commentator has noted:


Texas agencies can and do make rules in hybrid proceedings. For nearly sixty
years now the Railroad Commission has made field rules using contested case
procedures. . . . The Commission uses contested-case procedures, allowing parties
to conduct discovery, present testimony, and cross-examine opposing parties'
witnesses. Yet at the end the Commission issues rules of general applicability
binding on all operators in a field, whether they participated in the hearing, or
merely had notice of it, or even commenced operations in the field after the rules
are adopted.


Peter Schenkkan, Judicial Review of Agency Rules & Actions Under APTRA Section 12, State Bar
of Texas 5th Annual Advanced Administrative Law Course at U-7 (1993). Schenkkan went on
to conclude: "Section 12 [now APA § 2001.038] is certainly not solely for judicial review of the
results of Section 5 [now APA §§ 2001.023-.034] rulemakings." Id.

 Third, the agency statement was prospective in operation. Again, the Panhandle
Field rules clearly look to the future. Indeed, to the extent the rules were to be applied to existing
wells, they expressly established a one-year grace period for operators to bring such wells into
compliance.

 Finally, the Panhandle Field rules would not become concretely operative against
any individual until there had been a further proceeding involving that individual. For example,
the rules obviously contemplate an additional "enforcement"-type hearing before any individual
can be fined or otherwise sanctioned for a violation of the rules.

 Thus, the Panhandle Field rules fall within the APA's definition of "rule" and
satisfy the general requirements of an administrative rule.


II. The Proceeding by Which the Panhandle Field Rules Were Adopted Does Not Fall Within
the APA's Definition of "Contested Case"


 The APA defines "contested case" as follows: "'Contested case' means a
proceeding, including a ratemaking or licensing proceeding, in which the legal rights, duties, or
privileges of a party are to be determined by a state agency after an opportunity for adjudicative
hearing." APA § 2001.003(1). The proceeding by which the Panhandle Field rules were adopted
was not a contested case because the Commission's hearing was not an "adjudicative" one. (5)

 To "adjudicate" is to settle judicially, i.e., in the exercise of judicial or quasi-judicial authority. Rutherford Oil Corp. v. General Land Office, 776 S.W.2d 232, 234 (Tex.
App.--Austin 1989, no writ); see also Black's Law Dictionary 42 (6th ed. 1990); Webster's Third
New International Dictionary 27 (Philip B. Gove ed., 1986); Bryan A. Garner, A Dictionary of
Modern Legal Usage 27 (2d ed. 1995). This Court has recognized the inherently judicial nature
of the "adjudicative hearing" required in a contested case. Commenting on the definition of
"contested case" found in APA § 2001.003(1), we stated: "By 'adjudicative hearing,' we think
the legislature meant a hearing at which the decision-making agency hears evidence and, based on
that evidence and acting in a judicial or quasi-judicial capacity, determines the rights, duties, or
privileges of parties before it." Best & Co. v. Texas State Bd. of Plumbing Examiners, 927
S.W.2d 306, 309 n.1 (Tex. App.--Austin 1996, writ denied) (emphasis added); accord Ramirez
v. Texas State Bd. of Medical Examiners, 927 S.W.2d 770, 772 (Tex. App.--Austin 1996, no
writ). In the present case, therefore, determining whether the Commission was exercising a
legislative function or a judicial function is crucial in deciding whether the hearing conducted by
the Commission was an "adjudicative" one.

 The Texas Supreme Court has addressed the legislative/judicial distinction on more
than one occasion. In Key Western Life Insurance Co. v. State Board of Insurance, 350 S.W.2d
839 (Tex. 1961), the court said:


Many definitions of legislative functions and judicial functions have been set forth
by various courts. The Supreme Court of the United States stated:


"A judicial inquiry investigates, declares, and enforces liabilities as they
stand on present or past facts and under laws supposed already to exist. 
That is its purpose and end. Legislation, on the other hand, looks to the
future and changes existing conditions by making a new rule, to be applied
thereafter to all or some part of those subject to its power." Prentis v.
Atlantic Coast Line, 211 U.S. 210, 29 S.Ct. 67, 69, 53 L.Ed. 150.



 In 73 C.J.S. Public Administrative Bodies and Procedure § 8, p. 306, it is said:



"It has been stated that the nature of the final act and the character of the process
and operation, rather than the general character of the authority exercised, is
determinative. The action of an administrative body or officer is adjudicatory in
character if it is particular and immediate, rather than, as in the case of legislative
or rulemaking action, general and future in effect."



Key Western Life, 350 S.W.2d at 847.

 In discussing the legislative nature of setting utility rates, the supreme court said
in another pre-APA case:


It is fundamental that in Texas the fixing of domestic utility rates is a legislative
function of the state government . . . . Utility rates as rules of conduct are
prospective only and do not in any manner involve an "adjudication" of rights
arising from a "past" controversy. It is true that the fixing of rates requires a
study of existing and past facts, but the rate as promulgated is not "res adjudicata"
of any fact so studied.


Railroad Comm'n v. Houston Natural Gas Corp., 289 S.W.2d 559, 562 (Tex. 1956).

 This Court too has addressed the general distinction between legislative action and
judicial action:


A government function is legislative, and not judicial, when it "looks to the future
and changes existing conditions by making a new rule, to be applied thereafter to
all or part of those subject to its power." Prentis v. Atlantic Coast Line Co., 211
U.S. 210, 226, 29 S.Ct. 67, 69, 53 L.Ed.150 (1908). Therefore, the Ordinance
clearly is legislative because it regulates future behavior rather than adjudicating
past disputes.



City of Austin v. Quick, 930 S.W.2d 678, 684 (Tex. App.--Austin 1996), aff'd, 41 Tex. Sup. Ct.
J. 751 (May 8, 1998), reh'g granted, 42 Tex. Sup. Ct. J. 154 (Nov. 19, 1998).

 Applying the foregoing standards, the Commission's proceeding by which the
Panhandle Field rules were adopted was not an "adjudicative" one. Although trial-type
procedures were used, no individual party's rights, duties, or privileges were adjudicated. Many
of the same reasons why the Panhandle Field rules qualify as "rules" are the same reasons why
the proceeding does not qualify as a "contested case." The character of the Commission's
proceeding did not change in midstream: from the outset, its purpose was to produce rules. And
what was produced was an agency statement (1) that was not stated to apply to specifically named
individuals, but to a generally described class or category (operators in the Panhandle Field),
(2) to which new members--who would be bound by the rules--could be added later, (3) which
would be prospective in operation, and (4) which would not be concretely applicable to any
individual without a further proceeding involving that individual. These characteristics are the
essence of a rule and the antithesis of an adjudication.

 Accordingly, the proceeding by which the Panhandle Field rules were adopted was
not a contested case.


III. The Commission is Statutorily Required to Use Trial-Type Procedures in Promulgating
Field Rules in Some Circumstances


 The fact that the Panhandle Field rules were adopted pursuant to trial-type
procedures is immaterial to the issue of whether the rules may be challenged under APA
§ 2001.038. As we held in ARCO, the purpose of the APA was only to establish minimum
procedural standards; accordingly, "there is nothing in the APA preventing an agency from
employing contested-case procedures in promulgating rules." ARCO, 876 S.W.2d at 489; see
also APA §2001.001(1). We also noted that "[a]lthough the purpose of a rulemaking proceeding
is essentially investigative rather than adjudicative, we perceive no reason why there should be
only a single manner in which a factual investigation may be conducted. An evidentiary, trial-type hearing is clearly one way to investigate facts." ARCO, 876 S.W.2d at 489 n.8. Finally,
we held that the Commission's enabling statute, originally enacted in 1935, requires the use of
trial-type procedures in promulgating field rules for the purpose of protecting correlative rights. 
Id. at 484-88; see also Tex. Nat. Res. Code Ann. §§ 85.049-.053 (West 1993). As with any
statute, the APA is presumed to have been enacted with complete knowledge of existing statutory
provisions and with reference to them. See Acker v. Texas Water Comm'n, 790 S.W.2d 299, 301
(Tex. 1990). We can think of no reason why the legislature would have wanted rules adopted
pursuant to those statutorily required procedures to be immune from challenge under APA
§ 2001.038.

 Finally, the fact that the Commission's document adopting the Panhandle Field
rules is called an "order" is also immaterial. Even rules promulgated pursuant to the APA's
notice-and-comment rulemaking procedures are adopted pursuant to an "order." See APA §
2001.033 ("A state agency order finally adopting a rule must include . . . ."); see also Pacific
Northwest Bell Tel. Co. v. Eachus, 813 P.2d 46, 48 (Or. Ct. App. 1991) (agency denomination
of statement as "order" does not make it an order when statement falls within statutory definition
of "rule").

 We hold that the district court of Travis County has jurisdiction pursuant to APA
§ 2001.038 to hear WBD's challenge to the validity and/or applicability of the Panhandle Field
rules. (6) Accordingly, we need not address the numerous other jurisdictional bases WBD asserts.


Collateral Attack/Exhaustion of Remedies

 In addition, the Commission contends that WBD's suit is an impermissible
collateral attack on a final order from a contested case and that a party wishing to challenge such
an order needs to exhaust all administrative remedies before seeking judicial review. The general
rule is that an agency's final order is immune from collateral attack, as is the final judgment of
a court. Alamo Express, Inc. v. Union City Transfer, 309 S.W.2d 815, 827 (Tex. 1958); Public
Utility Comm'n v. Allcom Long Distance, Inc., 902 S.W.2d 662, 666 (Tex. App.--Austin 1995,
writ denied). Because this action is brought under section 2001.038, however, it constitutes a
direct attack on the Commission's field rules. "A court may render a declaratory judgment
without regard to whether the plaintiff requested the state agency to rule on the validity or
applicability of the rule in question." APA § 2001.038(d). Thus, an aggrieved party does not
have to exhaust all possible agency remedies before bringing an action under section 2001.038. 
Texas Dep't of Human Servs. v. ARA Living Ctrs. of Tex., Inc., 833 S.W.2d 689, 692 (Tex.
App.--Austin 1992, writ denied).


Primary Jurisdiction

 Finally, the Commission contends the doctrine of primary jurisdiction prevents the
district court from hearing an "as-applied" challenge to the constitutionality of the Panhandle
Field rules. The supreme court, however, has declared the Railroad Commission's primary
jurisdiction "not to be so broad-sweeping as to oust the courts of jurisdiction just because the
Commission might have jurisdiction to determine some facts related to the controversy." 
Amarillo Oil Co. v. Energy-Agri Prods., Inc., 794 S.W.2d 20, 26 (Tex. 1990). The precise
function of the doctrine of primary jurisdiction is to guide a court in determining whether it
should refrain from exercising its jurisdiction until after an administrative agency has determined
the relevant question, or some aspect of the question, posed to the court. Kenneth C. Davis,
Administrative Law Treatise § 19.01, at 373 (1972). As this Court has stated, the primary-jurisdiction doctrine merely prevents a court from ruling on certain types of questions before they
have been decided by the administrative agency. ARCO, 876 S.W.2d at 478. In ARCO, we held
that because the Commission decided the question at issue when it adopted the challenged rule,
the primary-jurisdiction doctrine did not deprive the court of jurisdiction to determine the validity
of the rule. Id.

 Furthermore, it is an exception to the doctrine of primary jurisdiction that a court
may proceed when an agency is exercising authority beyond its statutorily conferred powers. 
ARA Living Ctrs., 833 S.W.2d at 692. Because we find the challenge to the Panhandle Field
rules to be authorized by APA § 2001.038, and because we consider the promulgation of these
rules as a final "decision" of the Commission on the subject matter they address, we conclude
that the doctrine of primary jurisdiction does not prevent a Travis County district court from
hearing WBD's suit.

 The Commission also argues that it should at least maintain jurisdiction to consider
the issues of compliance specific to WBD's wells. In ARCO, we rejected a similar argument by
the Commission that it should be allowed to conduct exception hearings before the issue was
heard in court:


We will not force the oil companies to be subjected to potential irreparable injury
while the Commission completes its exception hearings. As the Texas Supreme
Court has explained, "An administrative body cannot, by reserving for itself the
power to change a ruling, deprive the courts of jurisdiction to the detriment of the
parties injured by the ruling." Because Rule 90 went into effect immediately upon
its enactment, the oil companies had the immediate right to turn to the courts for
relief . . . . We will not require the oil companies to first be subjected to Rule
90(b)(2) before they may challenge its validity.



ARCO, 876 S.W.2d at 479 (citations omitted). This reasoning applies to the Panhandle Field
rules as well. WBD has alleged that one or more of its wells have already been sealed by the
Commission pursuant to those rules. WBD does not allege that the Commission has improperly
applied its own rules, but that even the "proper" application of the field rules violates various
statutory and constitutional provisions. Under these circumstances, the possibility that relief
might be provided by a contested-case proceeding within the agency concerning well-compliance
or exception issues is not sufficient to deny jurisdiction to the Travis County district courts to
hear a challenge brought under APA § 2001.038.


CONCLUSION

 We hold that a Travis County district court has jurisdiction to hear the claims
asserted by WBD. Accordingly, we reverse the district court's order dismissing WBD's suit for
want of jurisdiction, and we remand the cause to that court for further proceedings.



 

 J. Woodfin Jones, Justice

Before Justices Jones, Kidd and Powers*

Reversed and Remanded

Filed: February 4, 1999

Publish











* Before John Powers, Senior Justice (retired), Third Court of Appeals, sitting by assignment. 
See Tex. Gov't Code Ann. § 74.003(b) (West 1998).
1. The Defendants in the trial court below were the Railroad Commission of Texas and Dan
Morales in his Official Capacity as Attorney General of the State of Texas. The following parties
intervened, aligned with the Railroad Commission: Anadarko Petroleum Corp.; MidCon Gas
Services Corp.; Natural Gas Pipeline Company of America; Midgard Energy Company; Conoco
Inc. For convenience, we refer to these parties collectively as the "Commission."
2. Although the Commission apparently did not actually consolidate all of the oil and gas fields
in the Texas panhandle into a single field, we will, for convenience, refer to these fields
collectively as the "Panhandle Field."
3. Professor Bonfield has described the purpose of this statutory exclusion as follows:


[This exclusion] is meant to assure that matters of internal agency management that
are purely of agency concern are effectively excluded from normal rulemaking
requirements. Such an exclusion is justified because of the undue burden on the
agencies and small public benefit to be gained from utilization of such procedures for
these statements. On the other hand, the limitations found in [the exclusion] are
meant to assure that agencies do not abuse that exception to the public's detriment.


Arthur Earl Bonfield, The Iowa Administrative Procedure Act: Background, Construction,
Applicability, Public Access to Agency Law, the Rulemaking Process, 60 Iowa L. Rev. 731, 834
(1975) (commenting on a provision of the Iowa APA almost identical to section 2001.003(6)(C)
of the Texas APA).
4. Section 1(7) of the 1961 Model Act provided that


'rule' means each agency statement of general applicability that implements,
interprets, or prescribes law or policy, or describes the organization, procedure, or
practice requirements of any agency. The term includes the amendment or repeal of
a prior rule, but does not include (A) statements concerning only the internal
management of an agency and not affecting private rights or procedures available to
the public, or (B) declaratory rulings issued pursuant to Section 8, or (C) intra-agency memoranda.


For an analysis of the differences between the definition contained in the original Texas act (which
was carried into APA § 2001.003(6) by non-substantive codification in 1993) and the definition
in section 1(7) of the 1961 Model Act, see Dudley D. McCalla, The Administrative Procedure and
Texas Register Act, 28 Baylor L. Rev. 445, 448-49 (1976).
5. In the 1961 Model State Administrative Procedure Act, on which the Texas APA was based,
the term "hearing" was not preceded by the modifier "adjudicative." The Texas Legislature added
that modifier to emphasize the distinction between the type of hearing required in a contested case
and the type of hearing required in a rulemaking proceeding. See Dudley D. McCalla, The
Administrative Procedure and Texas Register Act, 28 Baylor L. Rev. 445, 448 (1976).
6. We do not share the concerns expressed in the dissenting opinion. Initially, the dissent
argues that the result we reach mandates that the term "rule" be given a broad meaning in APA
§ 2001.038 and a different meaning in other sections of the APA. Our holding does not produce
such an effect. Rather, the term "rule" should be given a broad construction throughout the APA. 
Giving it a broad construction in the notice-and-comment procedure sections increases the
instances in which agencies will have to give notice to the public of proposed rules, thereby
furthering the stated policy of "provid[ing] for public participation in the rulemaking process." 
APA § 2001.001(2). Giving the term a broad construction in section 2001.038 makes it easier for
an aggrieved party to challenge a rule that has been promulgated without the requisite opportunity
for public participation or that is invalid for some other reason. This portion of the dissenting
opinion also ignores two important factors: first, that the APA establishes only minimum
standards of practice and procedure for administrative agencies, see APA § 2001.001(1); and
second, that the issue here is whether an agency statement adopted under certain procedures is
challengeable at all under APA § 2001.038, not whether an agency statement adopted under those
procedures is valid.



 The dissent next argues that our holding will have "paralyzing consequences," asserting in
effect that every letter, memo, and brief sent or filed by an agency will be subject to challenge
under section 2001.038. No such consequences will occur. To be of "general applicability" and
therefore challengeable under APA § 2001.038, such a statement would not only have to be stated
in terms of a general class or category of persons, but would also have to be intended to be binding
on that general class or category. It is difficult to imagine a context in which an agency would
issue a letter, memo, or brief containing such a statement. But in the event it did, then by all
means such a statement should be subject to challenge under section 2001.038. With respect to
the dissent's comments on the setting of public utility rates, we simply note that the APA expressly
declares a ratemaking proceeding to be a contested case. See APA § 2001.003(1). This provision
arguably reveals a legislative intent that contested-case procedures should be the exclusive means
for obtaining judicial review of a ratemaking order, although we emphasize that this question is
not before us and we express no opinion thereon. It is definitely not, however, our intention to
engraft onto the APA two methods for simultaneous judicial review of the same order.



rom utilization of such procedures for
these statements. On the other hand, the limitations found in [the exclusion] are
meant to assure that agencies do not abuse that exception to the public's detriment.


Arthur Earl Bonfield, The Iowa Administrative Procedure Act: Background, Construction,
Applicability, Public Access to Agency Law, the Rulemaking Process, 60 Iowa L. Rev. 731, 834
(1975) (commenting on a provision of the Iowa APA almost identical to section 2001.003(6)(C)
of the Texas APA).
4. Section 1(7) of the 1961 Model Act provided that


'rule' means each agency statement of general applicability that implements,
interprets, or prescribes law or policy, or describes the organization, procedure, or
practice requirements of any agency. The term includes the amendment or repeal of
a prior rule, but does not include (A) statements concerning only the internal
management of an agency and not affecting private rights or procedures available to
the public, or (B) declaratory rulings issued pursuant to Section 8, or (C) intra-agency memoranda.


For an analysis of the differences between the definition contained in the original Texas act (which
was carried into APA § 2001.003(6) by non-substantive codification in 1993) and the definition
in secti